—— IN THE ——

# Supreme Court of Mississippi,

—— AT THE ——

## NOVEMBER TERM, 1905.

---

### SANDY BAYOU INJUNCTION CASE.

---

JOHN J. HENRY, WARDEN OF THE PENITENTIARY, ET AL., *v.*
STATE OF MISSISSIPPI.

[39 South. Rep., 856.]

STATE. *Suits by.  Governor.  Power to bring.  Constitution* 1890, *secs.*
116–143.  *Code* 1892, § 2156.

The powers of the governor are defined by Constitution 1890, secs.
116–143, and Code 1892, § 2156, and he is not empowered thereby
to institute a suit for and in the name of the state.  Such power
is not deducible from:

(*a*) Constitution 1890, sec. 116, providing that the chief executive
power of the state shall be vested in the governor; nor

(*b*) Constitution 1890, sec. 119, providing that the governor shall
be the commander in chief of the army and navy of the state
and of the militia, except when they shall be called into the
service of the United States; nor

  (*c*) Constitution 1890, sec. 123, providing that the governor shall
  see that the laws are faithfully executed; nor

  (*d*) Any other constitutional or statutory provision.*

FROM the chancery court of, first district, Hinds county.

HON. ROBERT B. MAYES, Chancellor.

This suit was begun in the name of the state of Mississippi,
the appellee, by James K. Vardaman, governor of the state, as
complainant, against Henry, warden of the penitentiary, and
others, including the members of the board of control of the peni-
tentiary, and Horace J. McLaurin, the appellants, as defendants.
From a decree overruling a motion to dissolve a preliminary
injunction which had been issued in the cause the defendants
appealed to the supreme court. The facts are fully stated in the
opinions.

### OPINION OF THE CHANCELLOR.

"Attempting no review of the facts in this case, any further
than is necessary to set forth my opinion, I proceed at once to a
discussion of the questions involved.

"First—In the arguments of the case before me, counsel repre-
senting the defendants in the bill concede that the governor has
the lawful authority to institute the proceedings in behalf of the
state, and for that reason there need be no discussion of this point.

"Second—The main question in the case presented for my
determination, according to my view of it, is as to the validity of
the order of the board of control and the contract made there-
under. In order to discuss this question it is necessary to set
out in full the order of the board and to give certain portions of
the contract which I will discuss. The order of the board is:

" '*Resolved*, That the board of control work with the convicts
for the year 1906 Sandy Bayou plantation, owned by H. J.

---

* While not determined by the court in this case, both Chief Justice Whitfield and Jus-
tice Truly discussed in their opinions the questions afterwards decided in *State ex rel.
Greaves* v. *Henry, Warden, etc.* (the Sandy Bayou mandamus case), *post* p. 125; the Chief
Justice in the latter case adhering to and more fully treating the views expressed by him in
this case, and Justice Truly concurring in the opposing views there expressed by Justice
Calhoon.

McLaurin, and shall receive for their share of the crop and for the labor of the convicts $25,000.00 (twenty-five thousand dollars), which sum the said McLaurin guarantees to the state certain and in all events for said year; the number of convicts to be employed on same to average seventy, if so many be necessary to the proper cultivation and harvesting of the crop thereon.'

"It will be noted that the resolution of the board itself recites that the state is to receive for its 'share of the crop' and 'for the labor of the convicts' $25,000, 'which sum the said McLaurin guarantees to the state certain and in all events for said year.' Pursuant to this resolution of the board, it entered into the following contract with McLaurin, after reciting that it was entered into on December 5, 1905, between the state of Mississippi, acting by and through its board of control, and H. J. McLaurin—viz.:

" 'First—That the board of control has agreed to work the plantation in Sharkey county, state of Mississippi, owned by the said McLaurin, and known as "Sandy Bayou," for the year 1906.

" 'Second—That the said board of control shall pay to the said McLaurin, for the use of said plantation for said year, all the crops grown, raised, and gathered on said premises for said year, after the sum of $25,000 shall have been reserved therefrom, and the said McLaurin guarantees that the crop raised on said premises shall amount to $25,000, and binds himself to the said board of control in that sum, promising to make up whatever the crops grown on the said premises may fall short of that amount.

" 'Third—That the said board of control shall have absolute authority over the labor employed in working said land, and that said labor shall be under the direction of said board and of the persons appointed by the board.

" 'Fourth—That the said McLaurin, in addition to the land leased and furnished by him, shall also furnish the necessary mules and teams for working of said plantation, and feed for

same, and shall also furnish all wagons and farming implements and planting seed.

" 'Fifth—That the said board of control shall have said crops made, harvested, and gathered.    This act executed in duplicate.'

"The resolution of the board provides that the state of Mississippi shall receive 'for its share of the crops and for labor of the convicts $25,000,' and when the contract itself is stripped of all its verbiage and made to reveal just what it is, it is a contract between the board of control of the state of Mississippi to lease to H. J. McLaurin, for the consideration of $25,000, paid to the state by McLaurin, seventy convicts for the year 1906, to be worked under state supervision on the private plantation of McLaurin, known as 'Sandy Bayou.'    This contract is this, and no mere phraseology or adroit use of language can make it anything else, when viewed in the light of its plain stipulations and the thing agreed to be done by the state and McLaurin.    McLaurin is the owner of the land, and the contract and the resolution recite that the state has leased it; and yet the lessor, McLaurin, the owner of the land, is the only one who agrees to pay rent. What is he paying the $25,000 to the state for?    He is certainly not paying this sum to the state for the use of his own land. Then if he is not paying this sum to the state for the use of his own land, but is still paying this sum to the state for the use of something, what is it, if it is not for the use of seventy convicts to work this land 'under state supervision?'

"But this is not the only objection to this contract.    Conceding that this is a lease of the plantation, and not a lease of the convicts, as above stated, it is still violative of both the spirit and the letter of the constitution.    The resolution provides, and the contract stipulates in express terms, that McLaurin shall have all that the labor of the convicts produces on the plantation, over and above $25,000 reserved to the state for the use of convicts, thereby giving to McLaurin, a private individual, a direct interest in the labor of the convicts, a thing that is expressly prohibited by the constitution.    If there is one thing in the constitution

that is plain, it is that no individual citizen shall have any interest of gain or loss, individually, in the labor of the convicts. If there was one thing that the constitution aimed at, it was the humane treatment of its convicts, and the taking away from each and every individual of the commonwealth any private interest in the labor of convicts, thereby taking away the inducement that any one might ever have to work them excessively and, for purposes of gain to themselves, grow rich upon the sweat and blood of these unfortunates. Let us examine the sections of the constitution bearing upon this subject, and it will be seen that this conclusion is inescapable. Section 223 of the constitution provides that 'no penitentiary convict shall ever be leased or hired to any person or persons, or corporation, private or public, or *quasi* public, or board, after December 31, 1894, save as authorized in the next section.' Section 224, which is the next section, expressly referred to in section 223, says 'the legislature may authorize the employment, under state supervision and proper officers and employés of the state, of convicts on public roads, or other public works, or by any levee board of any public levees,' etc. It will thus be seen by those two sections that leasing the convicts to any private person is expressly prohibited by section 223, and when not worked according to the scheme outlined by this section they can only be worked according to section 224, which provides that they can then only be worked on public works, and this under state supervision; and, as if to emphasize the fact that there can be no private interest in the convicts by any individual of the commonwealth, the same section of the constitution, a little further down, says, 'but said convicts shall not be let or hired to any contractors under said board,' speaking with reference to any levee board working on public levees. It will thus be seen that, even though the convicts may be worked on public works, so careful was the constitution to guard against any individual of the commonwealth having any interest of gain in the labor of the convicts that it prohibits the letting or hiring of convicts to any contractor working for the board even on public works.

"But it was argued to me, and the contract and the order of the board of control recite, that the board of control shall have absolute authority over the labor employed in working the said land. The constitution plainly says that there shall be no leasing or hiring to any private individual, with or without the board of control retaining authority over the convicts, and, even though the order of the board retains this, it is none the less prohibited by the constitution. There shall not be created in any individual of the state even the inducement to coerce convict labor. There are just four of these sections of the constitution on penitentiary and prisons, the manifest purpose and object of all of them looking to a more humane treatment of the convicts than had existed in the state when private letting was permissible. So cruel and inhumane had been the treatment of the convicts in many instances when private individuals were permitted to lease them, and thereby become interested in convict labor, that the constitutional convention placed it in the fundamental law of the state that never again should private individuals become in any way interested personally in the labor of the convicts, because this interest of personal gain led to all the cruelties that had theretofore existed. To this end the state reserved to itself the dominion and authority over the convicts. It was the policy of the state to work them under guards hired and paid by itself, the pay of whom was in no way dependent upon the production of the convict. When it authorized them to be worked in any other way than upon the farms of the state, it was upon public works, where no element of personal gain entered into the powers by whom they were to be worked and controlled, and even prohibiting them to be worked under any contractor of any board engaged in public works, thus all the time guarding against the element of personal gain to any private person, that which had proven to be the curse of the convict and a disgrace to humanity, if history correctly records the cruelties growing out of the private leasing system. The constitution aimed at prohibiting the wrong, and, by preventing private individuals becoming inter-

ested directly in the labor of the convicts as a matter of personal gain to themselves, undertook to tear up and destroy any inducement that might exist in any member of the body politic to excessive labor. Every individual in the commonwealth is alike interested in the labor of the convicts, but no individual of the commonwealth can contract lawfully under the constitution of the state, separate himself from the body politic, and obtain a special interest in the convict labor, over and above the interest of every other person, and if he does, the contract is void.

"Let us apply this to the contract of Mr. McLaurin. All the interest in the labor of these convicts, by virtue of this contract, is transferred from the state to McLaurin. If Sandy Bayou makes one bale of cotton, the state gets its $25,000; if Sandy Bayou makes 2,000 bales of cotton, the state gets the same. McLaurin is the only individual in the state that is interested in the production of these convicts, and their labor is a matter of gain or loss to him. The inducement to coercion is created by the contract, and an interest given in the labor of the convicts. McLaurin has a common interest with all the public in the $25,000 paid and an additional interest in the labor of the convicts, not shared in by the general public, in that his profit on the lands must arise from their labor. If a contract can be made that gives to the private individual an interest in convict labor, it thwarts and defeats the plain intent and letter of the constitution. It is my judgment that any contract made which leaves to the party from whom the land is leased any interest in the convict labor, is void as coming in conflict with sections 223 and 224 of the constitution of the state. If this contract had been a contract to lease on shares, giving to McLaurin one-half the produce of the place, or if it had given him one-twentieth of that produced by the convicts, or if it had given him any interest in the smallest degree in the labor of these convicts, it is void. Even if the laws providing that a lease of the lands may be made are constitutional, the board must pay a stipulated sum for the lands—in other words, lease the lands straight out, not giving to

the lessor any interest whatever in anything produced by the convicts—or the lease is void because in conflict with sections 223 and 224 of the constitution of the state of Mississippi.

"Third—Counsel for complainant in their argument urge that any law of the state authorizing the lease of lands by the board of control, upon which the convicts of the state are to be worked, is void because in conflict with section 225 of the constitution, and press upon the court a decision of this question. The contract made by the board with McLaurin is not a lease of land, but a lease of convicts. The question which is presented to me to decide is not a question arising by virtue of any action taken by the board of control under the statutes and laws in question authorizing the lease of land, and, this being the case, I shall follow the principle so often declared by our supreme court —that courts should never decide constitutional questions except when necessary to a disposition of the cause. *Hendricks* v. *State,* 79 Miss., 368 (30 South. Rep., 708).

"Fourth—Counsel for the defense argue that this is but an effort on the part of the minority of the board to control the action of the majority, and again, if they are mistaken as to this, it is an effort on the part of the complainant, by resort to the court, to control the 'discretion' of the board. If either of these propositions were correct as shown by the record in this case, the mere statement of them would furnish unanswerable argument. There is a universality of authority that this cannot be done by an appeal to the courts. But does the record present any such case? By section 123 of the constitution of the state, reannounced in Code 1892, § 2156, subdivision 'c,' it is made the duty of the governor 'to see that the laws are faithfully executed.' The board of control is of itself a creature of the law, and must act in subservience to the constitution and laws of the state. When it acts in violation of either, or both, it acts without authority. What is it that the board is sought to be enjoined from doing? Is it a matter about which they have either discretion or authority to act? I think not. If the board of control had

the authority under the statutes to lease a farm for the purpose of working the state convicts, or, in the alternative, place the convicts on lands already belonging to the state, as in their judgment would best subserve the interests of the state, and a majority of the board had decided in favor of the lease, no one would contend that the minority could control the majority by a resort to the courts, and the courts would not entertain such a suit. But the case stated above is not the case which confronts the court. The board of control have exercised an authority for which there is no warrant, either by statute or by constitution, but which is expressly prohibited by the constitution—to wit: They have leased seventy convicts for the year 1906 for a consideration of $25,000 to a private individual, said convicts to be worked under state supervision, which is expressly prohibited by the fundamental law of the state. Can it be argued that the authority charged by both the constitution and the laws of the state with the duty of seeing that the laws are faithfully executed, after protesting as a member of the board that the law is being violated, and without effect, shall remain supine and see the unlawful contract carried into execution? It is not a matter of discretion which is sought to be controlled. It is not a minority trying to control a majority, but it is the chief executive of the state trying to prevent the board of control from acting without authority and in violation of the law. *State of Mississippi* v. *Johnson,* 4 Wall., 493 (18 L. ed., 437), has no application in this case. The law as announced above is clearly recognized in the very authorities cited by counsel for the defense and relied on by them, and I use their authorities, showing that it is only in matters where there is to be an exercise of lawful discretion that the courts decline to act. *Gaines* v. *Thompson,* 7 Wall., 347 (19 L. ed., 62); *United States* v. *Seaman,* 17 How., 225 (15 L. ed., 226); *United States* v. *Guthrie,* 17 How., 284 (15 L. ed., 102); *United States* v. *Commissioner,* 5 Wall., 563 (18 L. ed., 692); *Litchfield* v. *Register,* 9 Wall., 575 (19 L. ed., 681); *City of New Orleans* v. *Paine,* 147 U. S., 261 (13 Sup. Ct., 303; 37 L.

ed., 162); *Simpson County* v. *Buckley,* 85 Miss., 713 (38 South. Rep., 104).

"Again, it is claimed that the board of control is a part of the executive department, and that a writ of injunction will not lie; that this court has no jurisdiction, because no property rights are involved.   In the case which is found in 180 U. S., 236 (21 Sup. Ct., 331; 45 L. ed., 497)—*Missouri* v. *Illinois*—reannouncing what has been decided *In re Debs,* 158 U. S., 564 (15 Sup. Ct., 900; 39 L. ed., 1092), it is expressly decided that in matters of public concern it is unnecessary that there should be involved any pecuniary interest of the state.   Many cases are cited by counsel for the defense, all of them holding that the governor of the state cannot be enjoined and that a writ of mandamus will not lie against him.   I have examined all the cases and the manner in which the question has arisen.   Nothing held in any of the cases cited conflicts in any way with my holding in this case. No injunction is sought against the governor; but the governor himself, in obedience to that command made on him by the constitution and the statutes of the state requiring him to see to the faithful execution of the law, seeks the injunction to prevent the trustees of the convicts of the commonwealth from dealing with the convicts in violation of the law and in disregard of the trust.   By virtue of this contract the finances of the state are involved, public right is violated, and seventy of the state's convicts are to be contracted away in violation of the law.   To argue that under these circumstances the governor cannot act and the courts have not the power to prevent is to argue impotency in the state's powers and to assume to the board of control an absolutism that is repugnant to every idea of the law.   Can the board of control, in disregard of the constitution, make a contract prohibited by the express terms of that instrument, and, when assailed by the power charged with seeing 'to the faithful execution of the law,' answer that power and the courts by saying that they are a part of the executive department of the government, and therefore not amenable to the courts, or that there are no property

rights involved, and that therefore the courts are powerless to assume jurisdiction? No case has been cited to me, and I safely say that no case will be cited to me, holding so monstrous a proposition, or that the governor, under the circumstances presented by this case, cannot institute the action, and that under the case as made by the record the courts are powerless to act in the matter. The right to do so is amply sustained by authorities. *State* v. *Lord* (Ore.), 43 Pac., 471 (31 L. R. `A., 473); *Simpson County* v. *Buckley,* 85 Miss., 713 (38 South. Rep., 104); *Wisconsin* v. *Cunningham* (Wis.), 51 N. W., 724 (15 L. R. A., 561); *State* v. *Saline County,* 51 Mo., 350 (11 Am. St. Rep., 454); *State* v. *McLaughlin,* 15 Kan., in part of opinion to be found on page 233 (22 Am. St. Rep., 264).

"For the reasons given above, I order that the motion to dissolve the injunction be overruled and the injunction retained."

*McWillie & Thompson,* for appellants.

There must be some limit to the powers and duties of the governor; his powers and duties ought to be distinctly executive in character, although in practice the legislature sometimes requires of him the performance of mere ministerial acts. His functions are never judicial. He is never, and never can be, required to exercise those powers or perform those duties which are expressly or by necessary implication given to or imposed upon other officers.

The general rule on the subject is this: The state can be recognized by the court as a suitor in legal proceedings only through the agents or representatives appointed by law to speak and act in its name, and unless a proper agent or representative is present, in legal contemplation the state is not present; and this presence of the agent or representative can be made known and attested only by the record. 20 Ency. Pl. & Pr., 589.

It must necessarily follow from the general rule that officers are not authorized to bring suits in the name of the state unless their warrant of attorney for so doing can be produced. Legis-

lative authority for the power must be pointed out.    Such authority in the governor cannot be pointed out; it does not exist.

Before calling attention to the state of our express constitutional and statutory law on the subject, we will be excused for calling the court's attention to two classes of cases which, upon a superficial view, are calculated to mislead:

(*a*)  Federal cases based upon rules of the supreme court of the United States for the regulation of procedure in suits brought under the clause of the constitution of the United States giving that court original jurisdiction in suits by one state against another, and which rules have been acted upon and applied by way of analogy in other cases, and in inferior federal courts in cases wherein a state was a party.

(*b*)  Cases in which states of the union have brought suits in the courts of another state.    In such cases the courts of the state in which the suit is brought will not, at the instance of the defendant, inquire into the law of the plaintiff state, but will assume that the officers of that state have correctly determined the question and that the suit was begun in pursuance of such a determination.

Coming now to our express constitutional and statutory provisions, we find:

(1)  That the governor is vested with the *chief* executive power of the state (const., sec. 116), but he is not vested with all executive power.    He is (const., sec. 119) commander in chief of the army and navy of the state and of the militia, except when they shall be called into the service of the United States.    The exception is especially to be noted, as will be seen further on. He is to see (const., sec. 123) that the laws are faithfully executed.

These are the only sections of the constitution relative to the governor which can be conceived to be applicable to the question under discussion.

The constitution then provides (sec. 133), in article 5, entitled "Executive," for a secretary of state, (sec. 134) for a state

treasurer, etc., empowering each to perform certain executive duties. The governor is not the secretary of state, any more than the secretary of state is the governor, and the same can be said of the governor and the treasurer and of the governor and every other officer provided for by the constitution, whether in the article entitled "Executive" or in any other article. The powers given and duties imposed upon one are denied to the others.

In article 6, entitled "Judiciary," we find that the judges of this court, the circuit judges and chancellors and justices of the peace, are provided for, and section 173 of the same article reads as follows:

"There shall be an attorney-general elected at the same time and in the same manner as the governor is elected, whose term of office shall be four years and whose compensation shall be fixed by law. The qualifications for the attorney-general shall be the same as herein prescribed for judges of the circuit and chancery courts."

A district attorney is also (sec. 174) provided for in the article on "Judiciary."

It will be observed that the powers and duties of neither the attorney-general nor the district attorney are prescribed by the constitution, but are left to be inferred from the nature of the offices and for legislative determination.

The governor is nowhere expressly authorized by statute to institute suits in the name of the state except in one state of case, Code 1892, § 2167, and this exception but proves the general rule that he is without such authority. We shall inquire presently whether he is empowered to do so by necessary implication. The attorney-general is expressly authorized to begin suits in the name of the state by the following statutes—viz.: Code 1892, § § 178, 180, 185, 190, 192, 2846, 3521.

Has the governor implied authority to institute this suit? Can such authority be predicated, by necessary implication, of any express authority given him? We think not. It cannot arise from the fact that he is chief executive officer of the state,

because we find that he does not possess all executive power, and it cannot be inferred from the fact that he is commander in chief of the army and navy of the state and the militia, except when they shall be called into the service of the United States. The exception to the section creating him the commander in chief shows that he is not commander in chief when the militia is in the service of the United States. The governor is an inferior officer to the president of the United States. Certainly it could not be contended with reason that the president of the United States, when in command of the state militia, has authority to institute and to prosecute this suit. The governor is not always the man on horseback.

The governor has no implied power to institute this suit arising from the fact that he is charged with the duty of seeing that the laws are faithfully executed.

The trouble about any argument seeking to establish the governor's power, predicated of the clauses of the constitution mentioned, is this: it proves too much. While the governor is charged with the duty of seeing that the laws are faithfully executed, he has not the power to perform the duties charged by law on every other officer of the state; he has no right by injunction to compel a justice of the peace to perform the law or to refrain from its violation; he has no right to interfere with any judicial officer, nor has he a right to control the sheriff or any other ministerial officer.

The truth of the business is, the institution of a suit, in the name of and for the state, is not an executive function. The discretion involved in the exercise of such rights is rather judicial in its nature than ministerial. We said in the beginning that the governor's duties are never judicial in their nature.

We must draw a distinction between the attorney-general of the state and the attorney-general of the nation. At common law in England the attorney-general was the creature of the crown, and so the attorney-general of the United States is the aid or assistant to the president; but the attorney-general of Missis-

sippi is a constitutional officer. He is provided for in the article of the constitution entitled "Judiciary;" his qualifications have to be the same as those of the judges. District attorneys are also provided for in the constitution in the article on the "Judiciary," and their qualifications are likewise defined. The legislature in its wisdom has provided that the district attorneys and attorney-general may, and shall, exercise the discretion and judgment required in determining when and what suits shall be brought by the state. It was never contemplated by the constitution makers or the legislature of the state that purely executive officers should be empowered to bring suits in the name and on behalf of the state.

Suppose the governor occupied the position of the attorney-general on this record, and this suit had been brought by the attorney-general, would the governor be empowered to dismiss the suit? Most assuredly not. And why? Because he has not power to control the discretion and judgment of the attorney-general in the matter of bringing suits. The attorney-general is the chief officer of the state and is invested with exclusive authority as to what suits shall be brought. If the governor has the right to institute suits for and on behalf of the state, then he would have the right to dismiss one brought by the district attorney or the attorney-general, and could do so in spite of the constitutional officer who had instituted it.

When the constitution provided for the attorney-general, it contemplated that he should perform the duties usually incident to the position and involved in the very name. It would be beyond the power of the legislature even to deprive him of that power. See *Tonella* v. *State,* 70 Miss., 701 (s.c., 14 South. Rep., 17), a case wherein this court held that the legislature even cannot empower a state officer to collect back taxes without an assessment, because the constitution has created the office of assessor, and the case is approved in the case of *Mangum* v. *Hawkins,* 78 Miss., 97; and we find in the case of *French* v. *State,* 52 Miss., 759, ample authority for the statement that the constitu-

tion makers, in creating an office, by implication gave the officer all the powers implied in the name conferred. That the governor is not the state was recently decided by this court in the case of *Colbert* v. *State,* 86 Miss., 769, wherein it was held that the governor has no power to exercise an option reserved by the state in its act authorizing issuance of bonds to call in the bonds and have them paid. This power could not be inferred from the fact that the governor was chief executive of the state, nor from the fact that he was commander in chief of the army and navy of the state, nor from the fact that he was charged with the duty of seeing that the laws were duly executed.

"The powers and duties connected with the office of the attorney-general are so numerous and varied that it has not been the policy of the various legislatures to attempt the difficult task of enumerating them exhaustively, and they have ordinarily been content, after expressly defining such as are deemed most important, to leave the residue as they exist at common law, so far as applicable to our jurisprudence and system of government."

In *People* v. *Miner,* 2 Lans. (N. Y.), 397, the court, by Mullen, J., said: "Most, if not all, of the colonies appointed attorneys-general, and they were understood to be clothed with nearly all of the powers of the attorneys-general of England, and as these powers have never been defined, we must go back to the common law in order to ascertain them. The attorney-general had the power, and it was his duty, (1) to prosecute all actions necessary for the protection and defense of the property and revenues of the crown; (2) by information, to bring certain classes of persons accused of crimes and misdemeanors to trial; (3) by *scire facias,* to revoke and annul grants made by the crown improperly, or when forfeited by the grantee thereof; (4) by information, to recover money or other chattels, or damages for wrongs committed on the land or other possessions of the crown; (5) by writ of *quo warranto,* to determine the right of him who claims or usurps any office, franchise, or liberty, and to vacate the charter or annul the existence of a corporation for

violations of its charter or for omitting to exercise its corporate powers; (6) by writ of mandamus, to compel the admission of an officer duly chosen to his office and to compel his restoration when illegally ousted; (7) by information to chancery, to enforce trusts, and to prevent public nuisances and the abuse of trust powers; (8) by proceedings *in rem,* to recover the property to which the crown may be entitled by forfeiture for treason, and property for which there is no other legal owner, such as wrecks, treasure-trove, etc.; (9) and in certain cases, by information in chancery, for the protection of the rights of the lunatics and others who are under the protection of the crown." 3 Am. & Eng. Ency. Law (2d ed.), 479.

"An attorney-general, in the exercise of the functions incident to his office, is endowed with large discretion over matters of public concern, and generally the exercise of such discretion is in its nature a judicial act, over which the courts have no control.

"Courts will not review discretion. *State* v. *Gleason,* 12 Fla., 190; *People* v. *Rosendale,* 76 Hun. (N. Y.), 103, affirmed in 142 N. Y., 126; *People* v. *Fairchild,* 67 N. Y., 334, affirming 8 Hun. (N. Y.), 334; *People* v. *Atty. Gen.,* 22 Barb. (N. Y.), 114; *People* v. *Central Cross Town R. Co.,* 21 Hun. (N. Y.), 476; *Thompson* v. *Watson,* 48 Ohio St. Rep., 552; *State* v. *Taylor,* 50 Ohio St. Rep., 120." 3 Am. & Eng. Ency. Law (2d ed.), 484.

*A. J. McLaurin,* on the same side.

There is no such thing as inherent power in a governor. The executive department is only equal to the judiciary department, and it is held that there is no inherent power in a court. *Austin & Northwestern R. R. Co.* v. *Cluck* (Texas), 64 L. R. A., 497; *Messner* v. *Giddings,* 65 Texas, 309.

The right to bring the suit as brought must have existed at the time the suit was brought, and nothing occurring afterwards could avail if such right did not at the beginning exist. *P. W. &*

*B. R. R. Co.* v. *Quigley,* 21 How. (U. S.), 202 (16 L. ed., 77) ; *Martin* v. *Kelly,* 69 Miss., 652.

The facts showing the right to bring the suit as it was brought —that is, that the attorney-general brought it—must have been averred in the declaration.    Gould's Pleading, ch. 4, secs. 13, 14.

The governor is an officer just like any other officer, and therefore derives his power from the law, and is governed by law and amenable to law, and must perform his legal functions, and has no power except that derived from law, just like any other officer. *Shelby* v. *Alcorn,* 36 Miss., 292.

The laws that he shall see faithfully executed are the laws that pertain to the duties and functions of his office.    It was never understood that he should go out and see whether or not the road overseers properly posted and worked their roads.

*Nominatio unius est exclusio alterius.*    The officers he can superintend are.shown in Code 1892, § 2158—the land commissioner, treasurer, and auditor of public accounts.    Those whom he can suspend are named in secs. 2158, 2170, and 2176.

The suits that he can require to be brought in foreign jurisdictions are named in sec. 2167.

Those that he can require to be brought in this state, and the manner in which they are to be brought, are named in sec. 2177.

It would be a sad day for Mississippi if it were held that there is any officer who is not governed by law, or whose duties are not defined and restricted by law.

*Williamson, Wells & Peyton,* also on the same side.

The state can be recognized by the court as a suitor in legal proceedings only through agents and representatives appointed and authorized by law to speak and act in its name.    Unless the proper agent or representative is present, in legal contemplation the state is not present in the court, and the presence of the proper agent and representative can be attested only by the record in the case.    This doctrine is clearly maintained in the

cases of *The People* v. *Navarre,* 22 Mich., 1, and *Benalleck* v. *The People,* 31 Mich., 200, in which it is distinctly held that, in the absence of a statute, no action can be brought on behalf of the state except by the proper public agent.

Unless the governor is authorized by the constitution and laws to institute suits for the state this suit has been improperly brought and the state is not in court. There is no clause in the constitution which authorizes the governor to bring suits. The only clause under which it can even plausibly be contended that he had the right to bring the suit is found in sec. 123, which provides that the governor shall see that the laws are faithfully executed. This section is found in the article defining the powers of the executive departments of the government, and authorizes the governor to execute the laws where they have been ascertained by the courts, and does not undertake to confer the power to bring a suit. *Randall* v. *State,* 16 Wis., 341.

Section 173 of the constitution provides that there shall be an attorney-general, who is made the chief law officer of the state, and by whom all suits for the state must be brought, and all suits against the state must be defended by him unless there is some provision in the legislation of the state authorizing other persons to represent the state. Code 1892, ch. 56, confers on the governor all the powers he has additional to those conferred by the constitution. These additional powers and his powers generally are defined in Code 1892, § 2156. The powers given in the constitution are there enumerated, and paragraph (*g*) provides that whenever any suit or legal proceeding is pending which affects the title of the state to any property, and which may result in any claim against the state, he (the governor) may direct the attorney-general to appear on behalf of the state and protect its interests. Paragraph (*h*) gives him authority to require the attorney-general or district attorney to inquire into the affairs and management of corporations under the laws. Paragraph (*i*) gives him authority to require the attorney-general to aid any district attorney in the discharge of his duties.

Under these enumerations of the powers of the governor he is required to act through the attorney-general in all litigation where the state is interested.

By Code 1892, § 2166, the governor is authorized to engage counsel to assist the attorney-general in a case to which the state is a party when in his opinion the interests of the state require it, the compensation of the attorney thus employed being subject to the action of the legislature; and by sec. 2167 the governor may order and direct suits to be brought, for and in the name of the state, in any other state or foreign jurisdiction for the recovery of money or property due the state, and for the prosecution of such suits may employ counsel and pay the fees and costs out of money provided for that purpose. By sec. 2177 the governor may require proceedings in court to be instituted where there is a treasurer, either state or county, or any tax collector shown to be a defaulter, and in that section it is the duty of the governor to notify the attorney-general in case the state treasurer is the defaulter.

These statutes alone authorize the governor to bring suits for the state, and the court will observe that in all of them the state must be represented by the attorney-general, except cases in a foreign jurisdiction, where the governor may employ attorneys independently of the attorney-general.

A careful study of this legislation defining the duties of the attorney-general and conferring powers upon the governor makes it clear that the only agent or representative authorized by law to appear for the state and the only officer by whom the suit can be brought in the name of the state is the attorney-general. If it be true that a legal proceeding in the name of the state can only be begun by and through the agents or representatives appointed by law to speak and act in its name, the instant case is one in which the governor has undertaken to act independently and without the consent of the attorney-general. The bill is not signed by the attorney-general.

We cite the court to the following authorities: *Fray* v. *Ma-*

*chie,* 68 Mich., 323; *Babcock* v. *Hanselman,* 56 Mich., 27; *Pitts* v. *McGee,* 172 U. S., 516; *People* v. *Navarre,* 22 Mich., 1; *Vrooman* v. *Michie,* 69 Mich., 42; *Benalleck* v. *People,* 31 Mich., 200; *Spencer* v. *Knight,* 116 Col., 108; *McCauley* v. *Kellogg,* 2 Woods (U. S.), 13; *Randall* v. *State,* 16 Wis., 941; *Oregon* v. *Lord,* 31 L. R. A., 473; Notes to 55 L. R. A., 495; 20 Ency. Pl. & Pr., 589.

*Frank Johnston, J. A. P. Campbell, Alexander & Alexander,* and *George B. Power,* for appellee.

The governor has the authority to maintain this suit under two provisions of the constitution of 1890. "The chief executive power of the state shall be vested in a governor." Section 116. "The governor shall see that the laws are faithfully executed." Section 123.

How can the governor "see that the laws are faithfully executed" unless he is allowed to invoke the judicial power of the state? If the laws of the state are being violated before his eyes, what power has he to prevent their violation, if he is to be denied the aid of the courts of the state? Can he use the military power that is vested in him by the constitution to prevent a violation of the laws of the state? There are but two ways of executing the laws; one is through the intervention of the courts, and the other is by the executive force and arms, which would be taking the law literally into his own hands.

The spectacle presented by this case now before the court on the contention of the appellant, McLaurin, is extraordinary. Here is a contract made in plain violation of the constitution and laws of the state by a majority of the board of control, leasing a lot of the state convicts to a private individual. This court stands armed with the plenary judicial power to cancel the contract and to order the convicts to be placed on the state lands, where they belong. The governor is anxious to vindicate the law and prevent this plain violation of the constitution, with the attorney-general standing in a position of neutrality. In

this condition of things, it is contended that the board of control, and the appellants, are beyond the power of the court, not because this court lacks the constitutional authority to prevent this violation of the constitution, but because there is no official to invoke the power of the court.

The logical effect of this contention is that the convicts will be kept on the plantation of a private individual under a convict-leasing contract during the whole period covered by the contract. The same thing may be done next year, and the next, and indefinitely, according to the will and pleasure of three members of the board of control.

The board stands, according to appellants' argument, practically and in fact above the governor and above the courts of the state; by this strange and extraordinary absence of a remedy, the board becomes, in fact and in effect, the final and exclusive arbiter of the constitution and the final judge of its own powers. It is impossible that a premise can be correct that leads to such an unprecedented and astounding result and that ends in such an extravagant conclusion.

It is argued by counsel for appellants that it is the exclusive prerogative of the attorney-general to bring this suit. The constitution nowhere confers upon this official the authority for initiating litigation for the state. The constitution confers no express powers or authority upon the attorney-general whatever. It creates the office, but is silent in respect to the duties and powers of the official. Nor is there any authority given to the attorney-general by statute to initiate litigation on his own motion, except in a single class of cases, and that is, he may file bills in equity to set aside fraudulent conveyances made by judgment debtors of the state. Code 1892, § 179.

The attorney-general may defend and prosecute cases in the supreme court. Code 1892, § 185. All other suits are to be directed to be brought by the governor or by a state officer. Code 1892, § 185. Suits on the bonds of state officials are to be brought upon the direction of the governor.

Code 1892, § 192. If, therefore, the attorney-general has the authority to bring this suit in the name of the state, the power or authority arises from implication, for it is nowhere expressly given. If we are to search for implications to invest the attorney-general with this authority, how can the necessary and unavoidable authority in the governor, springing out of the nature of his constitutional duties and powers, be denied or questioned? The governor, according to the very nature of things, can control the litigation of the state in the matter of instituting and dismissing suits.

We do not deny, in this argument, that the attorney-general may institute a suit of this character, but his authority to do this cannot deprive the governor of his executive prerogative of initiating litigation in the name of the state. The governor "is to supervise the official conduct of all executive and ministerial officers." Code 1892, § 2156 (d). "He is to see that all offices are filled and the duties thereof performed." Code 1892, *Ib.* (e).

If the authority exists in the attorney-general to bring this suit, it cannot well be denied that the governor could direct him to bring it. The governor must see that all officers perform their duties. Code 1892, § 2156 (e). And upon his failure to do so it clearly and logically follows that the governor could initiate this proceeding. If this is correct, the governor can institute the suit directly.

In the case of *The State* v. *Dubuclet,* 25 La. Ann., 478, the attorney-general of the state had taken an appeal from the lower court to the supreme court of the state, and had failed to file a transcript of the record and perfect the appeal. In the meantime the governor took an appeal. There was a motion made to dismiss the latter appeal upon the ground that there was no authority in the governor for taking it. Upon this the court held that the governor "clearly has the right to appeal on behalf of the state, and this right cannot be taken away from him, simply because another officer has been before him, when he

takes the appeal within the delays required by law." That case was not decided on any statutory provisions. The Louisiana constitution of 1868, then in force, is as follows: "The supreme executive power of the state shall be vested in a chief magistrate, who shall be styled the governor of the state of Louisiana." "He shall take care that the laws be faithfully executed."

The case of *Kentucky* v. *Dennison,* 24 How. (U. S.), 66, was a proceeding by the state of Kentucky, acting through the governor, against the governor of Ohio to compel him to surrender a fugitive from justice from Kentucky.

The question arose as to whether this was a suit by a state against a state, within the meaning of the federal constitution and the judiciary act. The court said: "Where the chief magistrate of a state is sued, not by his name as one individual, but by his style of office, and the claim made upon him is entirely in his official character, the state itself may be considered a party on the record. This was the case where the state was the defendant; the practice where it is plaintiff has been frequently adopted of suing in the name of the governor in behalf of the state, and this was the form originally used, and always recognized as the suit of the state."

The court then referred to the first suit brought by a state in that court, which was entitled in the bill as the suit of *The State of Georgia, by Edward Tellfair, governor of said state, complainant,* v. *Samuel Brailsford and others.* The second suit, as set forth in the pleadings, was, "His Excellency Edward Tellfair, Esquire, governor and commander in chief in and over the state of Georgia, in behalf of the state, complainant, against Samuel Brailsford and others, defendants." The court said further in its opinion: "Where the state is a party plaintiff or defendant the governor represents the state, and the suit may be, in form, a suit by him as governor in behalf of the state."

So it was held, in the case of *Governor of Georgia* v. *Madrazo,* that the proceedings instituted by Madrazo, in the United States district court in Georgia, against the governor of that

state in his official capacity as governor, was a suit against the state, and as such could not be brought by a private citizen against a state under the federal constitution.    1 Pet. (U. S.), 110.

In *Texas* v. *White,* 7 Wall., the court expressly recognized the authority of the governor of Texas to have the suit brought by the state against White and others in that court.

The supreme court of Tennessee, in the case of *The Governor* v. *Allen et al.,* recognized the authority of the governor to bring suits in his own name on bonds of a public character which were made payable to him. · There was no statute authorizing such suits, but the court said that this power belonged to the office inherently according to the constitutional structure of the state government.    *The Governor* v. *Allen,* 8 Hum., 176.

The supreme court of Georgia, in the case of *Alexander* v. *State of Georgia,* 56 Ga., 475, held that the governor had the authority to bring suits in the name of the state, under a statute giving him the authority to supervise the property of the state and to make proper regulations for its preservation.  The statute did not in terms authorize the bringing of suits, but it was an implied power according to the decision of the court.

Even if the governor did not have the general power to bring suits, it cannot be denied that he must have the authority in this particular case according to its own peculiar facts.

Argued orally by *T. A. McWillie, Ben H. Wells, C. H. Williamson,* and *R. H. Thompson,* for appellants; and by *C. H. Alexander, J. A. P. Campbell,* and *Frank Johnston,* for appellee.

CALHOON, J., delivered the opinion of the court.

A question sleeps on the doorsill of this case of much graver importance to the state and her people than anything involved in the controversy.   That question is whether a governor may, officially or in the name of the state, originate this litigation in

our domestic tribunals, unauthorized by statute, without the serious disturbance and threatened destruction of the autonomy and coequal independent rights of three separate departments of government under the constitution and laws of this republic as organized by the people in convention and in their legislature. It is essential to present the history of the proceeding and then the results of a careful examination by the rules of right reason in the light of authority.

The board of control of the state penitentiary is the creation of legislative enactment, and is composed of the three railroad commissioners and the governor and the attorney-general, five in all, and to this board the people have intrusted the management of the convicts and the affairs of the state penitentiary. The board passed the following—viz.: *"Resolved,* That the board of control work with the convicts for the year 1906 Sandy Bayou plantation, owned by H. J. McLaurin, and shall receive for their share of the crop and for the labor of the convicts $25,000.00 (twenty-five thousand dollars), which sum the said McLaurin guarantees to the state certain and in all events for said pear; the number of convicts to be employed on same to average seventy (70), if so many be necessary to the proper cultivation and harvesting of the crop thereon." According to it the contract was made as follows—viz.: "First—That the board of control has agreed to work the plantation in Sharkey county, state of Mississippi, owned by said McLaurin, and known as 'Sandy Bayou,' for the year 1906. Second—That the said board of control shall pay to the said McLaurin, for the use of said plantation for said year, all the crops grown, raised, and gathered on said premises for said year, after the sum of $25,000.00 shall have been reserved therefrom, and the said McLaurin guarantees that the said crop raised on the said premises shall amount to $25,000.00, and binds himself to the said board of control in that sum, promising to make up whatever the crops grown on the said premises may fall short of that amount. Third—That the said board of control shall have absolute authority over

the labor employed in working said land, and that said labor shall be under the direction of said board and of the persons appointed by the board. Fourth—That the said McLaurin, in addition to the land leased and furnished by him, shall also furnish the necessary mules and teams for working of said plantation, and feed for same, and shall also furnish all wagons and farming implements and planting seed. Fifth—The said board of control shall have said crops made, harvested, and gathered. This act executed in duplicate."

Thereupon a bill in equity was presented, beginning thus: "The state of Mississippi, acting at the instance of the governor of the state, and by its solicitors specially employed to assist in bringing and prosecuting this suit, files this bill of complaint," etc. Accompanying this bill is a letter, addressed to the law firm appearing as solicitors to the bill, as follows: "I wish, in behalf of the state of Mississippi and in its name, to have suit brought to enjoin the execution of any order of the board of control looking to leasing any farms for the coming year; and, believing that the interests of the state require it, I hereby retain your firm to assist in the case or cases to be brought for that purpose. Yours respectfully, (Signed) Jas. K. Vardaman, Governor." The bill is sworn to by "Jas. K. Vardaman, Governor of Mississippi," and on it a fiat for injunction was granted, resulting in a writ restraining three members of the board of control, the warden of the state penitentiary, and H. J. McLaurin, a party to the contract, "from making or executing a lease of the Sandy Bayou place from H. J. McLaurin, or using or working any convicts thereon during 1906, or from carrying out the order of the board for said leasing." The bill avers that the board "voted to lease" the place, "over the protest and against the vote of the governor," by a vote of three for and two against, and that this action of the board is "violative of the constitution and statutes of this state," states the reasons for this view, and prays for the injunction; and in the bill are these words: "The governor, acting under the powers given him by

the constitution and laws, and especially the power conferred by Code 1892, § 2156, has directed this suit to be brought."

This section 2156 of the code of 1892 is in the following words:

"Section 2156. *Powers Generally.*—In addition to the powers conferred and duties imposed on the governor by the constitution and by the laws as elsewhere provided, he shall have the powers and perform the duties following—viz. : (a) He is the supreme executive officer of the state. (b) He is the commander in chief of the militia of the state, and may call out the militia to execute the laws, to suppress insurrections or riots, and to repel invasions. (c) He shall see that the laws are faithfully executed. (d) He is to supervise the official conduct of all executive and ministerial officers. (e) He is to see that all offices are filled and the duties thereof performed, or, in default thereof, apply such remedy as the law allows; and if the remedy be imperfect, he shall acquaint the legislature therewith at its next session. (f) He shall make appointments and fill vacancies as prescribed by law. (g) Whenever any suit or legal proceeding· is pending which affects the title of the state to any property, or which may result in any claim against the state, he may direct the attorney-general to appear on behalf of the state and protect its interest. (h) He may require the attorney-general or district attorney of any district to inquire into the affairs or management of any corporation existing under the laws of this state or doing business in this state under the laws thereof. (i) He may require the attorney-general to aid any district attorney in the discharge of his duties. (j) He may offer rewards, not exceeding two hundred dollars, for escaped insane persons who are dangerous, and such other rewards as are authorized by law. (k) He may require any officer or board to make special reports to him upon demand in writing. (l) He shall transact all necessary business with state officers, shall require them to be present at their respective offices at all reasonable business hours, and may require information, in

writing, from any such officer relating to the duties of his office. (m) When deemed advisable, upon proceedings for the arrest of fugitives from justice in this state from other states or countries, he may commission a special officer to arrest such fugitives in any part of the state."

An amended bill, not sworn to, makes exhibits of the order and the pursuant contract, as hereinbefore set out, and also a further resolution of the board accepting the signed contract, and sets up that the contract was in fact a hiring of the labor of the convicts, and that it is void, whether a leasing of the lands or the labor. The two bills were demurred to. The defendants below, appellants here, made a motion to dissolve the injunction, which was overruled, and they appeal to this court.

The attorney-general is not made a party to the bill, either officially or in any other capacity. As stated, the governor's right to use the name of the state in suits in her own courts is based, in the bill, on the constitution generally, and specifically on Code 1892, § 2156. This section is in part a rehearsal of the constitution, and we find nowhere in either any such power expressly granted. It surely cannot be gravely urged, since the people in solemn convention ordained the organic law; that any of the servants they there provide for and assume to instruct can exercise powers not derived from that instrument by express grant or by necessary implication from the grant. It is undeniable that the attorney-general is the officer provided by the people as the legal adviser of the state, and it is agreed on all hands that he has the express statutory power to sue in its name, just as district attorneys have in the matters which the legislature has committed to them. But it is said the governor may also sue, because of necessary implication from the constitutional and statutory provisions that he is the "chief executive," that he is the "commander in chief of the militia to execute the laws," etc., and that "he shall see that the laws are faithfully executed," etc. In other words, the position seems to be that the attorney-general may sue by express warrant of law; but the

governor is to "see that the laws are faithfully executed," etc., and therefore the governor may sue, which sequitur is not plainly to be seen in construing powers under constitutions and statutes. If either may sue, it is interesting to examine results. May each bring a separate suit? If the attorney-general or a district attorney, in his proper sphere, sues first, may the governor appear and dismiss the suit because he is "chief executive?" It is idle to say the power would not probably be exercised. The people knew that powers given will be, or might be, exercised, in real or supposed emergencies, and they designed to confer power only where they have expressed the purpose or where it is necessarily implied from its expression. If the governor may sue because he is "chief executive," is it to be his opinion or that of the chosen legal adviser which is to control in determining when suit shall be brought? If he may sue because it is his duty to see that "the laws are faithfully executed," may he not, in any and every county, sue, in the home courts, on his own construction of the constitutionality of any contract made by any board of supervisors to work the roads or build a bridge, and this over and against the opinion of the district attorney, who is the statutory law adviser? The affirmative could not be denied in the argument, and this carries us irresistibly to an absurdity. It is idle to say that the legislature would resent by impeachment any such use of power. This body meets only once in two years, and no impeachment would lie against an officer for doing what he was empowered to do. Neither the courts nor the legislature can attack the conscience.

Certain it is that it would not be done by the present distinguished executive. But who can speak for all who may follow him? Great publicists all agree that populations are happiest in absolute despotisms where the despots are wise and good. The difficulty is in the tenure. The successor may be bad, and there must, therefore, be stability of rights or the opportunity of ruin and slavery. We can imagine governors who would cheerfully lend themselves, for political ends, to influential factions who

wanted to annoy with no chance of incurring costs. This would be practically impossible to elected law officers, with reputation for law learning, with the oath as attorneys upon them, and the responsibility they are under to the world in the books of reports. To say the most, it would be but remotely possible. Private persons are jealously guarded against the use of their names in lawsuits where they have given no authority for the use. How much more important to a state! When men vote for a governor, they have no thought that they are voting for a law adviser. In the eighty-eight years that we have been a state, this is the first instance of a suit by a governor, unless in the early days on bonds and obligations made payable to him. This in itself is conclusive of the public and executive construction of the scope of powers, and the courts yield to such public construction from such lapse of time. The position of appellee logically forces to the conclusion that the chief executive may dismiss a prosecution for crime in any court of the state in defiance of the district attorney, elected by the people to look after their law matters. The constitution of the United States also has a clause that the president "shall take care that the laws be faithfully executed." Yet who ever heard of a suit by that officer? In the case of *United States* v. *Throckmorton,* 98 U. S., 61 (25 L. ed. 93), the decision of the court (supreme court of the United States) is in the following words, so far as pertains to this question: "The allegation in the opening of the bill already cited implies that Mr. Van Dyke, the district attorney, is plaintiff; but if, construing it liberally, we hold that the United States is plaintiff, the statement is clear that it is brought by the district attorney, and not by the attorney-general. Leaving out of consideration all mere questions of form, there arises no presumption from the act of congress, which gives the department of justice a general supervision over the district attorneys, that the suit was brought by his direction; for the district attorneys bring innumerable suits, indictments, and prosecutions, in which the United States is plaintiff, without consulting the attorney-gen-

eral, and they do this in the strict line of their duty. In the class
of cases to which this belongs, however, the practice of the Eng-
lish courts, and of the American courts also, has been to require
the name of the attorney-general, as indorsing the suit, before it
will be entertained. The reason of this is obvious—namely:
that, in so important a matter as impeaching the grants of the
government under its seal, its highest law officer should be con-
sulted, and should give the support of his name and authority to
the suit. He should also have control of it in every stage, so
that if, at any time during its progress, he should become con-
vinced that the proceeding is not well founded or is oppressive,
he may dismiss the bill."

May the attorney-general dismiss the bill now before us? It
is said he cannot, because the governor is commander in chief
and required to "see that the laws are faithfully executed." In
other words, the governor can do in this state what the president
cannot do in the courts of the United States. If the governor
can so act under his powers as commander in chief, and under
the duty to see that the laws are faithfully executed, why may he
not nullify the decrees of the courts because he thinks they do
not comport with the constitution? *Alexander* v. *Georgia,* 56
Ga., 479, cited by appellee, has no pertinency, except that by im-
plication it is an authority in favor of the appellants, in that the
governor's right to sue is based only on an express statute making
it his duty, which statute is to be found on p. 483 of the vol-
ume, and confines the duty to particular specified property. The
same may be said of the case of *State* v. *Dubuclet,* 25 La. Ann.,
161, cited by appellee. On p. 162 it is shown that the gov-
ernor's right to appeal a case, already brought and lost by the
attorney-general below, is sustained in these words: "The letter
as well as the spirit of the law gives us the required jurisdiction."
That it was on the letter, see 27 La. Ann., 30, citing the statute.
And see hereafter in this opinion. The case of *Governor* v. *Al-
len,* 8 Hum. (Tenn.), 176, is also produced. That merely
holds that a governor may sue, as governor, on bonds made pay-

able to his predecessor, officially; and there could be no inter-regnum in the office of governor. There is no need to go out of Mississippi for that; it has been so held here in the early days, when official bonds were made payable expressly to the then governor by name. *Parmilee* v. *Mc-Nutt,* 1 Smed. & M., 179. Even there the court was unnecessarily cautious enough, on p. 184, to note that no objection was made to the right of the governor to sue as "A. G. McNutt, governor of the state of Mississippi." There could seem to be no question that the head of a corporation, private or political, has the right to sue on an obligation made payable directly to him or his predecessor in office. But this has no even remote bearing on the question now before us. The case of *Compton* v. *State,* 38 Ark., 601, is referred to for appellee. There it was held that the governor, while he might have properly employed additional counsel in that case under the statute law, "yet he did not, and, without authority from the legislature, could not, make such a contract with the solicitor as would give him a lien upon the fruits of the litigation"—that is, on the amount he recovered. In that case "the legislature had previously authorized the governor to take such steps as he might deem proper to recover possession of the bonds."

It seems plain that the general words of the constitution, which always and everywhere must be construed strictly against powers, cannot carry by any sort of implication the power claimed here. We are warned against drawing such far-fetched conclusions by elementary law writers. It is "thumb-paper" law. It is drilled into the youth of the republic. In Walker's American Law, p. 104, we find this wise clause: *"Power of General Supervision.—* It is a duty enjoined upon the federal and state executives 'to see that the laws be faithfully executed.' It would be dangerous, however, to treat this clause as conferring any specific power which they would not otherwise possess. It is rather to be regarded as a comprehensive description of the duty of the execu-

tive to watch with vigilance over all the public interests." This is all that the constitution meant. No authority can be found in any of the reports of any of the states sustaining the forced and unnatural construction urged for appellee. It is not probable that one vote could be had in a constitutional convention to empower the executive to sue at discretion in the home courts. It is certain that, under the federal government and under the government of any of the several states, no instance occurs, except that at bar, where the president or any governor has contended for the power set up here, and yet all the constitutions have the same or equivalent clauses. The power has been claimed and recognized in suits in foreign jurisdictions, such as federal and other state courts, and so our legislature has wisely conferred express power upon the governor to sue in foreign jurisdictions. There can be no political complications or clash of prerogatives there, as at home; and so, in giving the power there, the legislature tacitly excluded the idea of its exercise at home.

It is not easy to understand the pertinency of the many references to federal decisions as to how states may sue and be sued in the United States courts, the service of process on them, etc. The United States constitution and laws provide for such suits, but fail to provide how they should be brought, in whose name, etc., and how process should be served on them as defendants. And so the supreme court of the United States, having the jurisdiction conferred on it, properly determined that it was not to remain powerless, and adopted rules to apply in such cases. Among them is this: "1. Ordered, that when process at common law or in equity shall issue against a state, the same shall be served upon the governor, or chief executive magistrate, and the attorney-general, of such state." *Grayson* v. *Virginia,* 3 Dall., 320 (1 L. ed., 619). This was in 1796. As late as 1860, in *Kentucky* v. *Dennison,* 24 How., 66 (16 L. ed., 171), these rules are referred to as in force, and that case shows that service on the governor and attorney-general is enough to make the state a party, and that in these foreign jurisdictions the governor may

sue in behalf of the state.  So in *Texas* v. *White,* 7 Wall., 700 (19 L. ed., 227), in 1869, cognizance was taken of a case brought by Texas, under the sanction of the governor elected and the governor appointed by the president, in that court—a jurisdiction foreign to the state of Texas.  It is clear that the governor may. sue in the name of the state in the courts of the United States, and a suit so brought would be recognized.  This state has given him the express power to do so.   It is also true that this state may be sued in foreign courts on process served on the governor and the attorney-general. · It might be the only way to reach it, if its legislature was silent as to the mode of service upon it.  In such case it could be made aware of the suit most properly by service on its political head.  But all this is far away from the internal policy of a state in reference to invoking the action of its own courts.

Under the laws of Mississippi the governor may sue in foreign jurisdictions.    Code 1892, § 2167.    Under other laws the revenue agent may sue in matters pertaining to his province. May the governor sue, regardless of him ?   So as to the land commissioner in matters pertaining to his functions.    May the governor sue, regardless of him ?   He ought to be able to do so, under the argument of appellee, as chief executive, with the duty to see that the laws are executed.   In *People* v. *Navarre,* 22 Mich., 1, the court says (p. 4) : "The state can only be recognized by the courts as a suitor in legal proceedings through the agents or representatives appointed by law to speak and act in its name." This is reiterated in *Benalleck* v. *People,* 31 Mich., 200, and in *Babcock* v. *Hanselman,* 56 Mich., 27 (22 N. W., 99), holding the attorney-general to be the proper representative of the state in legal proceedings.   So in *People* v. *Pacheco,* 29 Cal., 210, holding that the attorney-general is the only person authorized.   So in *State* v. *Railroad Co.,* 22 Neb., 313 (35 N. W., 118).   The case of *Succession of D'Aquin,* 9 La. Ann., 402, after holding the same, uses this language:   "The power for appearing for another in judicial proceedings is a very grave power, and one

which the law carefully scrutinizes in the case of individuals; and the importance of such a power is obviously not to be less appreciated in the case of the state. The consequence of a power to appear for another in a court of justice is the irrevocably binding force of 'the thing adjudged' upon the party for whom the appearance is made; and where the interests of the state, which are the interests of all its citizens, are involved, courts of justice should not pass upon these interests unless the state is properly before it through the officers recognized as its representatives by the constitution of law." We refer, also, to *Parker* v. *May,* 5 Cush. (Mass.), 336, in which the proceeding was begun "by Samuel D. Parker, Esq., attorney of the commonwealth for the county of Suffolk, acting in this behalf by the requirement of the governor, pursuant to statute;" and its purpose was to enforce a trust for general charity. The court said, through Shaw, C. J., that the power to institute a suit "in order to establish and carry into effect an important branch of the public interest is understood to be a common-law power, incident to the office of attorney-general;" and further, on p. 338, this celebrated judge expressed "great doubts" whether the governor's requirement would authorize the suit, but finally holds that, the power being existent in the attorney-general alone, it was not vitiated by the fact that the governor directed it.

Recurring to *State* v. *Dubuclet,* 25 La. Ann., 161, to which we have referred and which was cited for appellee, we now refer to *State* v. *Dubuclet,* 27 La. Ann., 30, wherein the court says, through the same judge: "Looking to act No. 21 of the acts of 1872 (p. 61), the statute under which the governor acted in this case, we find that he has the right in case of the absence, death, resignation, or inability to act in any particular case of the attorney-general or proper district attorney, or where either of them may be directly interested, to designate an attorney for such case to act in behalf of the state, for the protection of the public interest. Was the governor authorized under this statute to consent to the transfer of the case

and the trial thereof at this term, notwithstanding the opposition of the attorney-general who tried the case in the court below? We think not. The attorney-general is the proper officer to represent the state in all her lawsuits, and the statute in question was not intended to deprive him of the control and management of his cases. In order to protect the public interest in any particular case where the attorney-general was interested or was unable to act from death, resignation, absence, or from any other cause, this statute authorizes the governor to appoint an attorney for such case. It does not authorize him to give consent for the transfer of any particular case and for the trial thereof before the return-day at a different term of court. The act gives him no personal control of the case whatever. When the condition happens upon which he has authority to supply counsel for the state, the attorney designated by him takes control of such case. The attorney designated by the governor in this case does not consent to its trial here. But, under the statute, the governor was utterly without authority to appoint an attorney to act in this case, because the attorney-general is not personally interested; he has not resigned, nor is he dead, or absent, or unable to attend to the duties of his office."

On the functions of the attorney-general and their exclusive character, we refer to *Commonwealth* v. *Burrell,* 7 Pa., 39; *State* v. *Baker,* 38 Wis., 71-80. In *State* v. *Lord,* 28 Ore., 529 (43 Pac., 479; 31 L. R. A., 473), we find this: "But do we find here what may be termed an information or bill by the law officer of the state? As such an officer is the only person competent to institute a proceeding of the nature under consideration, the information should show upon its face in no uncertain manner that he is the officer instituting and prosecuting the suit, and the sole person responsible for its inception and maintenance. The most common form of instituting like proceedings, it seems, has been in the name of of the attorney-general. *Coosaw Mining Company* v. *South Carolina,* 144 U. S., 565 (12 Sup. Ct., 689; 36 L. ed., 537). Less frequently they are brought in the name

of the crown, or the state, upon the relation of the attorney-general. *State, ex rel.,* v. *Hibernian Saving Association,* 8 Ore., 396. And, if permissible at all to bring the suit in the name of the state alone, the complaint or information should show upon its face that the appropriate law officer brings the same for or in behalf of the state. The proceeding in either form would fix the responsibility for the maintenance thereof upon that officer, and it is not believed that the mere affixing of his signature in his official capacity to a complaint or bill shown to be the bill of a private relator is sufficient to impress it with the functions and capacity of an information competent to put in motion the machinery of the courts, whereby they will take cognizance of questions pertaining to the high prerogative powers of the state, or affecting the whole people in their sovereign capacity. See *State* v. *Saline County Court,* 51 Mo., 350 (11 Am. St. Rep., 454) ; *Bigelow* v. *Hartford Bridge Co.,* 14 Conn., 578 (36 Am. Dec., 502) ; *State* v. *Anderson,* 5 Kan., 115 ; *Buck Mountain Coal Co.* v. *Lehigh Coal Co.,* 50 Pa., 100 (88 Am. Dec., 534) ; *Iroquois County Supervisors* v. *Keady,* 34 Ill., 296 ; *People* v. *Pacheco,* 29 Cal., 213 ; *Attorney-General* v. *East India Company,* 11 Sim., 380 ; *Bobbett* v. *State,* 10 Kan., 15 ; *United States* v. *Throckmorton,* 98 U. S., 70 (25 L. ed., 93). Having reached these conclusions, the decree of the court below will be reversed and the complaint dismissed."

In the case of *In re Fire, etc., Commissioners,* 19 Col., on p. 503 (36 Pac., 241), it is said: "In this provision of the constitution, the phrase, 'to execute the laws,' contemplates the enforcement of a judicial process—that is, the enforcement of a right or remedy provided by the law and judicially determined and ordered to be enforced, and not an arbitrary enforcement by the executive of what he may consider the law to be." *People* v. *Martin,* 19 Col., 573, *et seq.* (36 Pac., 543 ; 24 L. R. A., 201). That a governor cannot employ counsel without express legislative authority, see *Randall* v. *State,* 16 Wis., 362, and *Cahill* v. *Board,* 127 Mich., 487 (86 N. W., 950 ; 55 L. R. A., 493).

The latter case, after so holding, refers to *State* v. *Dubuclet,* 25 La. Ann., 161, *supra,* and supposes that that case, cited here by counsel for appellee, must base its decision, that the governor could authorize an appeal in a case where the state was interested, on the constitutional clause that he should "see that the laws are faithfully executed," and thinks this because it found no Louisiana statute. We have found it in the acts of 1872, as quoted in 27 La. Ann., *supra.* The case in 127 Mich. (86 N. W., 55 L. R. A.), *supra,* also says the decision in *Alexander* v. *State,* 56 Ga., *supra,* cited for appellee, was based on express statute, as it undoubtedly was. That the attorney-general, "even with the approbation of the governor," could not employ an attorney to assist in the prosecution of a claim of the state for land, see *Julian* v. *State,* 122 Ind., 68 (23 N. E., 690), and same case, 140 Ind., 584 (39 N. E., 923). These cases require express statutes, although they have in Indiana the same constitutional provision, which, if it gave the governor the right to sue, would necessarily imply the right to employ counsel. See note 55, L. R. A., 493. The attorney-general has complete control and may dismiss a case at pleasure. *People.* v. *Tobacco Mfg. Co.,* 42 How. Prac., 162; *Attorney-General* v. *Barstow,* 4 Wis., 567.

In view of the authorities and of the fact that we have a written constitution undertaking to define powers, and in view of the spirit and genius of the government of these states of the American union, we utterly repudiate any suggestion of any power in the governor or any other officer over and above the constitution. We say, too, that if the power sought to be exercised here could be thought a matter of doubt even, it must be decided that it does not exist. No court has ever deviated from the position of rejecting powers claimed which are doubtful. The constitutional or statutory grant must be plain. The whole people are vitally concerned in this principle, as much so as in that very mudsill of the republic that the three departments must be kept inviolably coequal and independent each of the other. No argument can be based on the evils which might

result if the attorney-general refuses to proceed. If this be a hiatus in the law, so be it until the legislature shall see fit to act. Better the hiatus than the destruction of a great and essential principle, from which it is an easy leap to the crunching of the bones of the constitution. But there is no trouble. It is a simple matter to bring this question here right. Until it is so brought before the people, sitting as this tribunal, it should not be considered any more than if it were between individuals. No court ever considered the merits of any cause after holding there was no right to sue. Judges do not sit as moot courts to hear academic disputation, in the decision of which their conclusions would be mere *obiter dicta* and without force. Nor must they yield and decide because the public may want a speedy decision. These walls are imperviously padded to public clamor, the howls of mobs, and the storms of political factions.

If there could be any foundation for the argument that the power to sue is inherent in the mere office of governor at common law, as in the case, possibly, of the attorney-general, which we deny, still a new order of things clearly appears in the constitution of Mississippi, which devotes many sections in article 5 to defining executive powers. There is no break in the authorities that where there is an undertaking to set forth powers, all must be presumed to be included, and that the charter only can be looked to, with its necessary implications, for the limit of authority. There can be no inherent power to sue, unless in the attorney-general; even if in him, without statute. On careful examination it will be found that not one of the cases cited by the counsel or in the dissent of the chief justice sustains, even remotely, the contention of appellee. The only thing they find looking that way is the dissenting opinion of a judge in a Louisiana case, and he cites no authority and shows no investigation of the question, but makes merely a tentative suggestion. No constitution of any of the forty-five states gives the executive the power to ignore the attorney-general, the common-law adviser, and sue at his own will in the state courts;

none ever will. No state legislature has ever done it; none ever will. There is no squint, or pretense, in this record that the attorney-general was ever applied to and refused to inaugurate this litigation. If there was, it would make no difference. In two or three states the legislatures have provided that the governor may sue where the attorney-general refuses his demand to sue; but there is no such statute in Mississippi, and courts are not organized to make laws, but to construe them when made. There is here what purports to be a request from certain individuals that the court decide as soon as may be, but what this has to do with the case cannot be explained. It will be an evil day when the courts cease to watch jealously to preserve the independence of the executive, and of the legislative, and of the judiciary departments, or when either becomes indifferent to the slightest encroachment of the other, as all great writers agree. We bow only to the acts of the legislature, speaking for the people, within constitutional limits. Requests do not make law. They are less than the idle winds.

There is no decree of the court below overruling the demurrer to the bill. The appeal is from a decree overruling a motion to dissolve the injunction. The attorney-general was not made a party defendant in the suit, if this could affect the matter. On the contrary, his right to sue is recognized in the bill, and he is expressly omitted as a defendant. My views, condensed as much as possible for me, are submitted with the utmost confidence to an unbiased profession, and yet it pains me to differ radically from the conclusion of the superior powers of one of my distinguished associates. Proceeding by the light before me, I should regard myself as betraying the people if I considered as a judge any case where the name of their state is used by any one unauthorized by their constitution or by the enactments of their legislature. None but the elect may tread this holy ground. I have an opinion, of course, as a citizen—a very distinct opinion—on the merits; but I represent the people, not as a citizen, but as their

officer, and should not speak officially about matters where their state is not present as a litigant in court.

*Reversed, injunction dissolved, and bill dismissed.*

TRULY, J., delivered the following specially concurring opinion:

I am in hearty accord with many of the sentiments expressed in the vigorous, able, and eloquent opinion delivered by my associate, Judge Calhoon—an opinion every syllable and word of which evidences the love for the rights of the people which fills the great heart of the writer. Many of the legal propositions advanced therein command my unqualified assent, and in the conclusion reached I concur specially. But as the ground of my concurrence and the considerations upon which my conclusion is based are, in the main, different from the ideas there advanced, I shall content myself with a few general observations upon the subject-matter of that opinion, and then proceed to a discussion of those questions which I deem decisive of this controversy. I deny that there is any official above the law. I affirm that every officer, whether high or low, must find warrant for every official action in the plain mandate of a constitutional or legislative provision, save only the bare exception that where a duty is expressly enjoined on an officer, or where the office originated under the common law (such as attorney-general), there may be, in addition to those enumerated in the constitution or statutes, certain implied powers necessary to the execution of the duties imposed upon the official. But in the case of a constitutional officer, like the elective governor of a free people, the chart of power is the constitution which creates the office, or the statute which expressly amplifies its powers, and the implied power must be a necessary, not a conjectural or argumentative, one. *Field* v. *People,* 2 Scam., 79. The people are sovereign. All power is vested in the people; no power can be exercised by any one, unless by the express grant of the people.

It is contended by the appellee that the warrant of power of

the governor in this proceeding is found in the provisions of Code 1892, § 2156, and points as express authority and command for his action to subdivision "b" and subdivision "c" of that section. The language specially selected upon which this contention is. based is that which clothes the governor with power to "call out the militia to execute the laws" and that which provides "he shall see that the laws are faithfully executed." If these be more than a mere general admonition that the governor, as chief executive, shall exercise a general supervision over the well-being of the state, and shall see that by no defiant and forcible resistance is the execution of the laws prevented, as has heretofore been uniformly held by eminent text writers (Tucker on Constitution, sec. 362; Walker's American Law, p. 104); if this general provision does more than contemplate "the enforcement of a right or remedy provided by law and judicially determined and ordered to be enforced"—*In re Fire Commissioners,* 19 Col., 503 (36 Pac., 234); if, I say, this be more than a mere recognition of a supervisory power; if it be a command, as contended, to the governor to institute proceedings, instead of a warning that he must exercise necessary power defensively—then assuredly the warrant must be a general one requiring of the governor that he shall see that all the laws be faithfully executed. It cannot mean an "arbitrary enforcement by the executive of what he may consider the law to be." *In re Fire Commissioners, supra.* It cannot mean that the governor may select those particular laws which he deems it necessary to have enforced and permit those of which he does not approve to be ignored or violated with impunity—to use the law as a dagger to his foe, a shield for his friend. Such construction would be to vest in the governor of a state more power than was ever claimed by the most sanguinary autocrat of an absolute despotism. If, then, the mandate be that he must see that all the laws are faithfully executed, the duty to see that the attorney-general does his duty and complies with the law is equally as binding as is the duty to see that the board of control follows the law. If it be his duty to initiate proceedings

at law to see that one law is executed, it is equally incumbent upon him to see that every law in every statute is faithfully complied with. This would destroy the equilibrium of powers of the three coördinate departments of government. This would involve us in holding that as it is the governor's duty to see that the laws are faithfully executed, and it is the attorney-general's duty under the law, as explicitly averred in the sworn bill, to "prosecute or defend for the state all actions, civil or criminal, relating to any matter connected with either of the state offices," and to "prosecute and defend therein [in the supreme court] all causes to which the state or any officer thereof, in his official capacity, is a party," and "act as counsel for any of the state officers in suits brought by or against them in their official capacity touching any official duty or trust and triable at the seat of government," therefore, if this be a suit proper to be brought in the name of the state, it was his duty to see that the attorney-general faithfully executed the law by instituting and prosecuting it. So, conceding the contention of appellee upon this point, the result can only be that it was the duty of the governor to see that the law was faithfully executed, and this required him to see that the attorney-general prosecuted the cause for the state, and this is the identical position contended for by appellants. So, like a bewildered huntsman lost in the forest, the argument for appellee wanders ever in a circle and comes back inevitably to the starting point. If to this it be replied that, perchance, in certain contingencies, the attorney-general should wrongfully refuse, upon demand of the governor, to institute a suit in the name of the state, we can only say that the remedy for this wrong is prescribed by the statute, and the duty of the governor under those circumstances pointed out by its plain provisions. Subdivision "e" of sec. 3156 provides that the governor "is to see that all offices are filled and the duties thereof performed, or, in default thereof, apply such remedy as the law allows; and if the remedy be imperfect, he shall acquaint the legislature therewith at its next session." And the remedy would be, if the action of

the attorney-general was wrongful, by impeachment or by prosecution for malfeasance or misfeasance in office. If, however, it be said that no such proceedings would lie for a refusal by the attorney-general to bring a suit in the name of the state when himself not convinced of the justice and legality of the cause, the manifest reply is that this would constitute no defense if the governor had the lawful power to dictate his official action, or control his legal discretion, in the prosecution of such suits as here contended. But whether the remedy be ample or not, whether it be provided for or not, the remedy, if there be evil and if remedy be demanded, lies with the legislative, and not the judicial, department.

It is not unworthy of note in this connection that in 1860, when the political horizon of the nation was already blackened by the clouds of that impending storm of sectional fury which eventually culminated (if the principle was righteous for which our fathers battled, and the abstract justice of which I dare still maintain), involving a nation in Titanic fratricidal strife, sweeping from its moorings the federal constitution and destroying those landmarks of constitutional rights which had been established by the wisdom of the jurists of old, this same question of the power of a chief executive under the general mandate to see that the laws "be faithfully executed" was submitted for the consideration of the great lawyer who then occupied the position of attorney-general of the United States. The effort was being made to induce President Buchanan to distort the general language of this phrase into a grant of power to the president of the United States to coerce the actions of subordinate officials in the discharge of legal duties. The attorney-general repudiated the idea, and announced, heedless of conditions confronting him, the true doctrine and the true interpretation of that provision of the federal constitution: "To the chief executive magistrate of the union is confided the solemn duty of seeing the laws faithfully executed. That he may be able to meet this duty with a

power equal to its performance, he nominates his own subordinates and removes them at his pleasure.    For the same reason the land and naval forces are under his orders as their commander in chief.    But his power is to be used only in the manner prescribed by the legislative department.    He cannot accomplish a legal purpose by illegal means, or break the laws himself to prevent them from being violated by others.    The acts of congress sometimes give the president a broad discretion in the use of the means by which they are to be executed, and sometimes limit his power so that he can exercise it only in a certain prescribed manner.    Where the law directs a thing to be done without saying how, that implies the power to use such means as may be necessary and proper to accomplish the end of the legislature. But when the mode of performing a duty is pointed out by statute, that is the exclusive mode, and no other can be followed. The United States has no common law to fall back upon when the written law is defective.    If, therefore, an act of congress declares that a certain act shall be done by a particular officer, it cannot be done by a different officer.    The agency which the law furnishes for its own execution must be used to the exclusion of all others."    Opinions of Attorneys-General, vol. 9, p. 518.

But it is useless to extend my remarks upon this branch of the case.    It is a work of supererogation to advance arguments to strengthen the well-fortified position maintained in the opinion of Judge Calhoon.    And I pass from this branch of the subject to another; for, while I believe as an abstract proposition it is the imperative duty of the attorney-general to represent the state in all prosecutions involving her interest, yet I am not satisfied to announce as a positive conclusion that, should a contingency arise where the private and personal interest of the individual occupying the office of attorney-general would be antagonistic to that of the state, the governor would be absolutely powerless or the state remediless in the premises.    But that is clearly not this case, for it is not intimated that the attorney-general has either personal or private interest in the instant case, and there is no

averment that he refused the use of his name.　Nor am I satisfied, in the absence of specific objection by the attorney-general, that what attorney prosecutes the suit for the state is so fundamental in its nature as to require a court of its own motion to dismiss the cause.　Therefore, acceding to the request of all the parties to this litigation to decide upon the validity of the contract in question, though such request cannot confer jurisdiction nor waive jurisdictional questions, I proceed immediately to a discussion of the points necessarily involved in that consideration.

But, as preliminary to a logical judicial consideration of the power of the board of control and the validity of the contract, it is necessary to decide whether its action, within the scope of its authority, is subject to review in any other tribunal.　And this is, in my judgment, the pivotal point in the case.　If the constitutional provisions treating of the penitentiary submitted to the legislature the power of determining for itself the proper method of handling the penitentiary and disposing of the convicts, it is an elementary principle of law that the manner in which the legislature exercised its discretion is absolutely unquestionable by the courts.　"It is not for us to define the limits of legislative discretion, nor, in the absence of constitutional inhibition, to declare laws void because, in our opinion, they are morally wrong or practically unjust."　Cooley's Const. Lim., 168, 172, 182; Potter's Dwarris, 368, 369; *Martin* v. *Dix,* 52 Miss., 64 (24 Am. St. Rep., 661).　To quote the words of the greatest authority on this subject: "The moment a court ventures to substitute its own judgment for that of the legislature in any case where the constitution has vested the legislature with power over the subject, that moment it enters upon a field where it is impossible to set limits to its authority and where its discretion alone will measure the extent of its interference.　The rule of law upon this subject appears to be that, except where the constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operate according to natural

justice or not in any particular case." Cooley's Const. Lim. (7th ed.), p. 236. "It is undoubted that, when a case is within the legislative discretion, the courts cannot interfere with its exercise." *Id.*, p. 75, note 1.

I will not attempt to elaborate the proposition just stated, because there is no well-reasoned adjudication of any court of last resort which, after exhaustive research, has been brought to my notice, even expressing a doubt of its soundness. I do not understand that there is any attempt to dispute that if the legislature was vested with power of action, clothed with discretion, given choice of lines of conduct, its action in the premises is conclusive. If there be such attempt, it is readily refuted by a bare reference to authorities. Again, if the legislature, in the legitimate exercise of its law-making function, delegated to the board of control a similar discretionary power in dealing with the convicts, its action, within the scope of its power and authority, is above judicial scrutiny. A power in the courts to supervise the discretion of executive bodies legislatively clothed with power to act has never been maintained where the action complained of was within the scope of the powers vested in them. It is manifest that this must be true; for if the discretion vested in a board be subject to review and control by the courts, the result would be the substitution of the judgment of the courts for the judgment of the legislatively chosen power. If the board of control in the instant case had the authority to make the contract in question, for any reason to permit this court or the chancery court to substitute the individual judgments of the judges for the judgment of the members of the board of control would be to destroy the power of the board and usurp its functions for the courts. "There is," says Mr. Cooley, "a certain class of cases in which the decision, when made, must from the nature of things be conclusive and subject to no appeal or review, however erroneous it may be in the opinion of other departments or officers. . . . The first of these classes is where, by the constitution, a particular question is plainly

addressed to the discretion or judgment of some one department
or officer, so that the interference of any other department or
officer, with a view to the substitution of its own discretion or
judgment in the place of that to which the constitution had
confided the decision, would be impertinent and intrusive."
Cooley's Const. Lim. (7th ed.), 74. It has been decided by our
own court—*State* v. *Jenkins,* 73 Miss., 523 (19 South. Rep.,
206)—that "the authority to provide for and control the con-
victs [was] vested in a board of control." If this was a con-
stitutional exercise of power on the part of the legislature, the
power and discretion thus granted the board is, within its legiti-
mate scope, absolutely uncontrollable.

The case of *People* v. *Inspectors and Agent of State Prison,*
4 Mich., 187, is strikingly similar in its salient features to the
one at bar. In that state the constitution and statute provided
that: "No mechanical trade shall hereafter be taught to con-
victs in the state prison of this state, except in the making of
those articles of which the chief supply for the consumption of
the country is imported from other states or countries." Under
this provision, the power of dealing with the convicts of the
state being vested in a board, that board entered into a contract
hiring to certain manufacturers the services of certain convicts
"to be employed in the business of wagon, sleigh, and carriage
making in the state prison or within the walls of the yard there-
of." It will be observed that upon the face of the contract it
was apparently in open and palpable violation of the express
mandate and inhibition of the constitution. It cannot be con-
tended with any show of reason, in my judgment, that the mak-
ing of wagons, sleighs, and carriages is not a mechanical trade,
and the relator averred that he had been injured by the result of
the contract; and yet, the contract having been made in the dis-
cretion of the board of inspectors, the supreme court held that
the general supervisory power given to the board was beyond
the control of any other tribunal. The court adverted to the

fact that it is the duty of the prison agent not to infringe upon the constitutional and statutory provisions. As pertinent to the exact question here presented, we quote from that opinion: "But who is to determine this question? Who determine what trades are within the spirit of the constitution? There can be but one of two ways: Either the agent must determine for himself or he must get some court to do it. In either case the inquiry is of a judicial or discretionary nature. But there is no court to whom the jurisdiction to make this inquiry is given, and no process appointed for instituting it. Consequently it must follow that no court can take jurisdiction, or, when taking it, can properly conduct the statistical inquiry. It then leaves the agent in the first instance to determine the question himself. It is another well-established rule, governing these cases, that, where the inferior tribunal has discretionary power and proceeds to exercise it, we have no jurisdiction or power to control that discretion by mandamus." So in *State ex rel. Taylor* v. *Lord* (Ore.), 43 Pac., 471 (31 L. R. A., 473)—a case much relied on by both my associates and from which they draw diametrically opposite deductions—the court refused to enjoin a state board of commissioners of public buildings, holding that such a body was governmental in its nature, its acts, pertaining to and affecting the welfare of the people at large, and hence not subject to injunction by the courts. And this, too, as plainly stated on p. 478 of 43 Pac., and p. 480, col. 2, of 31 L. R. A., although the law under which the board acted might be unconstitutional. To strengthen this view, let it be recalled that in this state the same rule obtains, though the duties required of the executive power be merely ministerial. *Railroad Co.* v. *Lowry, Governor,* 61 Miss., 102 (48 Am. St. Rep., 76).

But it is not necessary to go beyond our own court to find decisions bearing out in reason the conclusion reached by courts of other jurisdictions. In an opinion rendered by Judge Terral, a jurist whose rugged integrity impelled him ever onward in an unswerving line to the discharge of his duty, in *Branton* v.

*County,* 79 Miss., 277 (30 South. Rep., 659), a case dealing with the hiring of county convicts (a subject also treated of by the constitution), in which it manifestly appeared that the board of supervisors, the selected governmental body in that instance, had abused its discretion, and in one particular had violated the express letter of the statute, this court held that injunction did not lie to restrain the execution of the contract; and, finally, after having considered the matter in its varying phases, the court concludes its opinion by saying: "The bid of Johnson has been accepted, and a contract with him has been completed, and for that reason this remedy by injunction is inappropriate. Considering the several provisions of our statute and its general purport and intent, we regard the board of supervisors as having exclusive jurisdiction of the subject, and its actions are not supervisable by other courts." If, therefore, the power of the legislature over the subject-matter is not explicitly abridged by the constitution, and in the exercise of a plenary power it established the board of control and vested it with general supervisory powers over all matters connected with the penitentiary, its government, discipline, and working of the convicts in any manner not expressly and specifically prohibited by the constitution, the legal conclusion is inescapable that neither the action of the legislature in enacting the laws nor the discretion of the board in dealing with the convicts can be supervised or assailed in the manner here attempted. "The protection against unwise or oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people. If this fails, the people in their sovereign capacity can correct the evil; but courts cannot assume their rights." Cooley's Const. Lim., p. 236, note 2. None of the coördinate departments of government can assume a power not granted. Courts are amenable to this rule.

But, it is said, granting the accuracy of the general and abstract legal propositions stated, they are inapplicable to the concrete case, for two reasons: First—The legislation by which

it was attempted and intended to clothe the board of control with power to lease farms and work convicts thereon was unconstitutional and void.  Second—Even if such legislation was not void when adopted, it was repealed by subsequent legislation, and therefore the making of the contract here in question was beyond the power of the board and outside the scope of its duties. But here, again, before entering upon a consideration of the power of the legislature under the constitution and of the board under the statutes, we are met by the contention that the contract in question is not a lease of lands, but is a hiring of convicts.  If this be true, the case is at an end.  But is it true? The sworn bill did not regard it as a hiring of convicts, for the averment of that bill is that it is an attempt to lease lands.  The employment of counsel did not regard it as a hiring, because the letter itself mentioned it as a threatened leasing of a farm. It surely would not have been found necessary to employ counsel to restrain so palpable and willful violation of the express mandate of the constitution as the hiring of convicts for any purpose would be.  The board of control did not regard it as a hiring, because the resolution and the contract made in pursuance thereof speak of it as a leasing of land.  The chief justice, who granted the writ of injunction in this case, did not regard it as a hiring of convicts, because the prayer of the sworn bill, upon which he acted, asked for "a temporary injunction enjoining defendant members of the board of control from making or executing said lease of said Sandy Bayou place, or using or working any convicts thereon, during 1906, and enjoining said warden from keeping or employing convicts on said farm or carrying out said void order of the board, and enjoining said H. J. McLaurin from leasing said place to the board or taking any steps in the execution of said order of the board;" and the fiat granted in compliance with that bill ordered that the injunction issue "strictly in conformity unto the prayer of the above bill therefor."  In truth, it was never considered a hiring of the convicts until, some time after the injunction was issued,

an unsworn amended bill was filed containing this averment. It will not do to say the original injunction was issued in ignorance of the action of the board or before any action was taken; for this would be to impute to the distinguished chief justice of this court the folly of issuing an injunction to restrain the board of control from the exercise of its discretion before in fact any action, right or wrong, legal or invalid, had been taken. If the fiat was in fact so signed before any contract of lease was made, then the entire proceeding was void from the beginning; for the merest tyro in the legal profession would under no state of circumstances be brought to contend that any court could enjoin a board to which control of the subject-matter had been delegated from a mere threatened exercise of its discretion.

But, aside from this, is it a lease of land or is it a hiring of convicts? What, under our law and the decisions of this court, establishes the relation of landlord and tenant? What is a lease contract? Does the mere fact that the owner of the land is directly interested in the result of the labor of every individual who works in the crop make it a hiring of the person instead of a leasing of the land? Assuredly not. In *Schlicht* v. *Callicott,* 76 Miss., 487 (24 South. Rep., 869), and in *Alexander* v. *Zeigler,* 84 Miss., 560 (36 South. Rep., 536), the exact contract involved in the instant case in every of its important conditions was upheld as establishing the relationship of landlord and tenant. We are told that by "stripping this contract of its verbiage" the truth is then seen that this is a hiring of convicts, because the landlord gets the fruits of their labors and is directly and personally interested therein. The cardinal rule of construction first instilled into the mind of the student is that a contract is to be construed in accordance with its terms, and the intent of the parties arrived at by an interpretation of its provisions. Can it be possible that at this late day discredit is to be cast upon an axiomatic expression so firmly established as that? Cuvier, we are told, from the smallest fragment of a

bone could, by the power of his knowledge, describe to the minutest particular the entire animal represented thereby. This case furnishes a striking example of an absolute reversal of that process. Here, in order to understand the meaning of a contract, we must first strip it of its verbiage—the very thing which indicates to the legal mind the purpose and intent of the contracting parties—and then, having rejected the terms of the contract, are to reframe it according to our own ideas of its real meaning. It is said that the landlord is to pay $25,000, and that this, in some intangible way, constitutes the evil which vitiates the whole transaction. The question is asked, For what does the landlord promise to pay this money, if not for the hiring of convicts? The answer is apparent upon the very surface of the contract itself, when its terms are considered in the light of attendant circumstances, as every contract should be. The landlord promises to pay the money as stipulated for the interest of the state in the prospective crop to be produced. While new in the particular instance, it inserts no unusual provision in a leasing contract; for certainly the court may assume judicial knowledge for what is known to every landowner in the state, that leases are made for varying amounts of money or differing proportions of the products to be raised, and certainly it is not unlawful to agree to pay the tenant a fixed valuation for what his interest in the crop may be. But it is said, too, that this shows that the landlord might be called upon to pay money over and above the amount of crop produced upon the land. Conceding that this be true, improbable though it may be, when viewed in the light of the public records of the state, is it a ground of objection to a contract that the lessor is protected against the possible effect of calamitous events? I think not. Is it a hiring of the convicts because a proportion of the product of their labor is paid to the landlord? If so, every leasing of lands made since the constitution went into operation has been illegal, not because the leasing of farms is unlawful, but because every share contract has been a hiring of convicts, and therefore admittedly in

contravention of the constitution; because, no matter how small the amount may be that the landlord receives; no matter in what commodity it may be paid him—whether money, cotton, or corn—it was still the fruit of the labor of the convicts, and to that extent every landlord was directly and personally interested in such labor. Whether the landlord receives his rent out of the crop, in cash or in a share of the crop to be grown, in every case he is directly interested in the labor of those cultivating the land and the manner in which it is tilled. So, every time the state has in the past received one dollar in money, one pound of cotton, a single bushel of corn, from a leased place, it represented the fruits of the labor of the convicts, in the same sense that it is contended that the money mentioned in the present contract does. But does this convert the contract from a contract of leasing to one of hiring? To constitute a contract one of hiring, the test is whether those doing the work "hold such a relation to the employer that he can direct and control them in and about the work which they are doing for him." *Heard* v. *Crum,* 73 Miss., 157 (18 South. Rep., 935; 55 Am. St. Rep., 520). The contract here assailed as being a hiring of convicts distinctly provides that the lessee has absolute authority over the labor employed, and that the labor shall be under the direction of the board of control, the lessee, or its own employes.

But I will consume no further time in demonstrating the obvious. Interpreted according to every rule of construction known to the law, interpreted according to the intention of the parties, interpreted according to the views of every man connected with the transaction, whether opposed to or favoring the contract, it was a leasing of land. It is admitted that any attempt to invoke the restraining power of a court of chancery to coerce the discretion of any board before final action taken would not be permissible; but, ignoring the averments and prayer of the sworn bill on which the order herein was issued, it is insisted that this action was instituted after the contract was entered into, but before it was complied with, and hence, it is

said, the jurisdiction of the court is unquestionable. So be it. In order to get at the very heart of the matter, let all for which appellee contends on this point be admitted. Disregard the allegations of the sworn bill, and admit that the injunction was issued after the contract was executed. Sweep aside, as a tired child does its toys, the decision of this court in the Branton case, *supra,* and grant that, after a contract with reference to convicts has been completed, injunction is nevertheless the appropriate remedy. Nay, more: concede the full and complete jurisdiction of the court, and waive all objection to the manner in which the suit was brought. All this cannot avail appellee, even under the averments of the amended bill, unless it can also be shown that the contract is itself invalid, either because an unwarranted usurpation of power by the board or because fraudulently or corruptly entered into. Having reached this point, it now becomes necessary to consider the rights and powers of the legislature and of the board of control; and thus, at last, we are brought to the consideration of the constitutional provisions treating of the penitentiary and the convicts.

In construing constitutions, as well as all other written instruments, whether statutes or contracts, there are certain fundamental rules which must be adhered to—lighthouses established by the wisdom of years, marking out the channel which must be followed to arrive at the safe haven of a true construction. First, the intent of the parties must be ascertained. In constitutions that intent must be ascertained in view of known conditions: the old law, the evil which existed, the remedy which was applied. Such intention, if manifest from the plain language of the constitution, must be followed, regardless of other considerations. The will of the people must be carried out as expressed in the organic law of the state, framed by their chosen representatives. The true meaning once established, the constitution must be maintained inviolate. But where the language employed, as in this case, is vague and uncertain, susceptible of two interpretations, there are certain other rules and potential

circumstances which must enter into the consideration of the question. The chief among them is the question of what interpretation was placed upon the provisions by the framers themselves. Says Thomas Jefferson, in dealing with this question: "On every question of construction we should carry ourselves back to the time when the constitution was adopted, recollect the spirit manifested in the debate, and, instead of trying what meaning may be squeezed out of the text or invented against it, conform to the probable one in which it was passed." To this extent, then, it becomes valuable to ascertain what view was entertained by the constitutional convention itself—first, as to the meaning of the sections adopted; second, whether they were considered to be self-executing; third, whether they were mandatory to adopt a certain course or simply advisory to the lawmaking power.

As shedding additional light on this question, it must be borne in mind that all legislation concerning the subject-matter treated of by the constitution must be construed in *pari materia* with the constitutional provisions themselves, and this, showing the legislative construction placed upon the constitution, will of itself be most powerful in influencing a court in arriving at its conclusion. Says the supreme court of the United States in *Cooper Mfg. Co.* v. *Ferguson,* 113 U. S., 727 (5 Sup. Ct., 739; 28 L. ed., 1137): "As the clause in the constitution and the act of the legislature relate to the same subject, like statutes in *pari materia,* they are to be construed together. *Eskridge* v. *State,* 25 Ala., 30. The act was passed by the first legislature that assembled after the adoption of the constitution, and has been allowed to remain on the statute book until the present time. It must, therefore, be considered as a contemporary interpretation, entitled to much weight. *Stuart* v. *Laird,* 1 Cranch, 299 (2 L. ed., 115); *Martin* v. *Hunter,* 1 Wheat., 304 (4 L. ed., 97); *Cohens* v. *Virginia,* 6 Wheat., 264 (5 L. ed., 257); *Adams* v. *Storey,* 1 Paine, 90 (Fed. Cas. No. 66)." And in the case of *Board of Railroad Commissioners* v. *Railway*

*Company,* 64 Pac., 1066, the supreme court of California says: "In the case of *Stuart* v. *Laird,* 1 Cranch, 299 (2 L. ed., 115), the constitutional objection was made that the judges of the supreme court had no right to sit as circuit judges, not being appointed as such nor having commissions for that purpose. In passing upon the question the supreme court of the United States said: 'To the objection, which is of recent date, it is sufficient to observe that practice and acquiescence under it for a period of several years, commencing with the organization of the judicial system, affords an irresistible answer, and has, indeed, fixed the construction. It is a contemporary interpretation of the most forcible nature. This practical exposition is too strong and obstinate to be shaken or controlled. Of course the question is at rest, and ought not now to be disturbed.' In End. Interp. St., sec. 527, it is said: 'The greatest deference is shown by the courts to the interpretation put upon the constitution by the legislature, in the enactment of laws and other practical application of constitutional provisions to the legislative business, when that interpretation has had the silent acquiescence of the people, including the legal profession and the judiciary, and especially when injurious results would follow the disturbing of it. The deference due to such legislative exposition is said to be all the more signal when the latter is made almost contemporaneously with the establishment of the constitution, and may be supposed to result from the same views of policy and modes of reasoning that prevailed among the framers of the instrument thus expounded.' "

In addition to these sources from which the courts are directed to seek light, it has long been recognized that the contemporaneous construction placed upon a constitutional provision by the departmental officers of the government will be upheld, and, even though apparently wrong, will not be deviated from, unless for most potent reasons. Nowhere, perhaps, is this canon of construction and the weight to be given it more plainly stated than in Story on Constitution, sec. 408, from

which we quote: "And, after all, the most unexceptionable source of collateral interpretation is from the practical exposition of the government itself in its various departments upon particular questions discussed and settled upon their own single merits. These approach the nearest in their own nature to judicial expositions, and have the same general recommendation that belongs to the latter." Says the circuit court of appeals in *McFadden* v. *Mountain View Min. & Mill. Co.,* 97 Fed., 677 (38 C. C. A., 354): "It is said in support of the judgment given below that, where the words of an act of congress are plain and their meaning is clear, they must prevail, notwithstanding they have been otherwise construed by the officers charged with the execution of the law. That is perfectly true, but at the same time the rule is firmly established that the contemporaneous construction of a statute by those charged with its execution, especially when it has long prevailed, is entitled to great weight, and should not be disregarded or overthrown, except for cogent reasons and unless it be clear that such construction is erroneous. *U. S.* v. *Johnston,* 124 U. S. 236, 253 (8 Sup. Ct., 446; 31 L. ed., 389) ; *Edwards* v. *Darby,* 12 Wheat., 206 (6 L. ed., 603) ; *U. S.* v. *Moore,* 95 U. S., 760 (24 L. ed., 588) ; *Hahn* v. *U. S.,* 107 U. S., 402 (2 Sup. Ct., 494; 27 L. ed., 527) ; *U. S.* v. *Philbrick,* 120 U. S., 52, 59 (7 Sup. Ct., 413; 30 L. ed., 559) ; *Manufacturing Co.* v. *Ferguson,* 113 U. S., 727 (5 Sup. Ct., 739; 28 L. ed., 1137). Moreover, the legislative construction of its own act is always potent. 'If it can be gathered,' said the supreme court in *U. S.* v. *Freeman,* 3 How., 556, 564 (11 L. ed., 724), 'from a subsequent statute in *pari materia,* what meaning the legislature attached to the words of a former statute, they will amount to a legislative declaration of its meaning and will govern the construction of the first statute.' " I venture to assert that the rules above announced will not be gainsaid or their correctness challenged by any one familiar with the rudimentary principles of constitutional construction.

Turning, now, from the abstract propositions which must

serve as our guide in the future discussion of this question, we will proceed in the pathway pointed out by the light shed by those rules upon the question. We find that the constitutional convention itself placed an interpretation upon the provisions here under review absolutely antagonistic to the position assumed by counsel for appellee; and surely the binding force of such interpretation, placed upon the instrument by the framers themselves, cannot be ignored or lightly passed over. By an ordinance of the convention, adopted and promulgated with the constitution itself, the great lawgivers whose genius is embodied in that instrument placed upon the provisions here involved their own interpretation and announced the purpose and intent of their adoption:

### "*Penitentiary Ordinance.*

"Be it ordained by the people of Mississippi in convention assembled:

"Section 1. With the view of enabling the legislature at its next session to have before it the necessary information upon which to act, if it should determine to establish a penitentiary farm, it is made the duty of the governor to appoint five commissioners, who shall, prior to the next session of the legislature, carefully inspect such bodies of land as may be thought suitable for such location, and who shall make report to the governor as to the several advantages of the bodies of land inspected by them, and as to the propriety of establishing such farm or some other system, and as to the advantages of each, cost, and other proper matters, to be laid by the governor before the legislature, with such recommendation as he may see proper to make.

"Adopted by the convention November 1, 1890."

It will be seen from this that it was expressly left to the decision of the legislature whether it (the legislature) "should determine to establish a penitentiary farm"—not that the legislature must establish it, but that it should decide if such a farm

should be established. And the commission to be appointed by the governor in pursuance of this ordinance was instructed, not to select and purchase land for the establishment of a penitentiary farm, but simply to report the advantages of the lands inspected by them and their views as to the propriety of establishing such farm or "some other system." Can it be successfully contended, in the face of this solemn declaration by the framers of the constitution itself, that the legislature was expressly commanded to establish a penitentiary farm? Such a position would be to absolutely nullify the entire effect of the ordinance. By this ordinance, as I conceive, it was recognized that power was granted the legislature to establish a penitentiary farm or "some other system," such as its wisdom might devise. The report of the commission was provided for simply to assist the legislature, by the advice and judgment of its members, as to the value and advantage of the several tracts of land, in the event the legislature determined to establish a state farm.

The next step shedding light on the constitutional provisions treating of the penitentiary was taken by the governor of the state in his address to the legislature of 1892, the first session after the adoption of the constitution. At that time, it must not be lost sight of, the constitutional provisions with regard to the penitentiary were already in force so far as concerned the repeal of conflicting laws. Section 275 of the schedule of the constitution says: "All laws of this state which are repugnant to the following portions of the constitution shall be repealed by the adoption of this constitution—to wit: Laws repugnant to (c) the provisions of secs. 223 to 226, inclusive, of article 10, prohibiting the leasing of penitentiary convicts." Remembering, then, that these constitutional provisions were in force; remembering that the laws repugnant thereto were repealed, and that affirmative action on the part of the legislature was imperative, it is interesting to note that in his biennial address to the legislature in 1892, Gov. John M. Stone, in discussing the report of the commission

upon the penitentiary question, employed this language: "Of all the lands examined and reported by the commissioners, should your honorable body decide to establish a penitentiary farm, the choice," etc., plainly showing that the mind of that great statesman, whose administration as chief executive is one of the brightest pages in the history of our commonwealth, and whose memory is still treasured by its citizens as a glorious heritage, did not understand that it was mandatory upon the legislature, but that it could treat with the question as if the whole matter had been submitted to its wisdom for action. This was the official contemporaneous construction made by the governor.

By sec. 278 of the schedule the governor was required to appoint a code commission of three men learned in the law, whose duty it was "to prepare and draft such general laws as are contemplated in this constitution, and such other laws as shall be necessary and proper to put into operation the provisions thereof and as may be appropriate to conform the general statutes of the state to the constitution." The public history of the state shows that the governor selected for this arduous and responsible duty three of the most learned and prominent practitioners who graced the legal profession of the state; and in order that they might be better able to draft such general laws as would conform the general statutes of the state to the constitution, the governor selected men all of whom had been members of the constitutional convention, the impress of whose genius was made upon that instrument and is now in its wise provisions crystallized and preserved for the admiration of coming generations. What interpretation did these men place upon the constitutional provisions dealing with the penitentiary and convicts? The answer is to be found in the provisions of Code 1892, ch. 101, and especially in sec. 3201 of that code. And that section, sanctioned, approved, and adopted by the legislature, provided, as the constitution required, that the penitentiary convicts should not be leased or hired out, but that they should be worked in the peni-

tentiary and on a farm or farms leased for that purpose or provided by the legislature as a penitentiary farm. Thus it is seen that the legislative interpretation of the constitution, placed on it at the first session after the adoption of the constitution, was that it was allowable to work the convicts on farms "leased for that purpose." The one condition attached to any and all kinds of work, the dominant idea plainly stated, was that, whether worked on leased farms under sec. 3201 or on public works or levees, the labor was to be "under the sole control, management, and discipline of the officers and employes of the penitentiary," fulfilling the constitutional requirement that all labor of convicts should be "under state supervision exclusively," and thus preventing, it was intended, a continuance or repetition of the horrors alleged to have existed under the system of private hiring previously in vogue.

But it is insisted that the section is, and was at the time of its adoption, unconstitutional. Courts should not, says every text writer of any respectability, condemn any action of the legislative department as unconstitutional, unless, in the case of a state statute, the express provision of the constitution can be cited. Though the statute be "unjust or oppressive, impolitic or unwise," this will not justify the interposition of the courts. *Cole* v. *Humphries,* 78 Miss., 163 (28 South. Rep., 808). No unwritten public policy can control to overthrow a solemn declaration of one of the three coördinate departments of government. Cooley's Const. Lim., p. 239. To doubt the validity of a statute is to affirm its validity. *Harmon* v. *Board,* 153 Ind., 76 (54 N. E., 105). Adopted as was the code of 1892, having been framed with the express purpose of making the general statute laws conform to the mandates of the constitution and to effectuate all the provisions of the constitution, having received the sanction of the legislative department, and acted on for a long term of years as constitutional, no provision contained in it should now be overturned unless its invalidity be demonstrable beyond question or quibble.

In addition to this legislative interpretation of the constitution, it is worthy of the gravest consideration to note that the provision of the code of 1892 dealing with the penitentiary and convicts was once in the past before this court for consideration. In that case a man, indicted for maltreatment of convicts, as his sole defense interposed by demurrer that the law under which his prosecution had been initiated had been repealed. Mark the facts: An indictment for maltreatment and cruelty to convicts, and a prosecution therefor; a demurrer to the indictment admitting the facts, but denying the legality of the prosecution. Mark the date: In the year 1895, long subsequent to the adoption of the constitution, after the code had been adopted and the legislature had met and adjourned in 1894. What says this court? Speaking through Whitfield, J., and dealing with the laws passed in 1892 and 1894, upon which the indictment was predicated, the court held that they were repealed by Code 1892, ch. 101, being the chapter containing sec. 3201. Proceeding to discuss the question, the court says: "Both acts were part of the system of law at that time governing the leasing of convicts. That whole subject was 'revised, consolidated, and reënacted' in the code of 1892. The lease system has been most wisely abolished (Code 1892, § 3201), and the authority to provide for and control the convicts vested in a board of control. See specially secs. 3172, 3173, 3176, 3202, 3216." *State* v. *Jenkins, supra.* So we see that at that time, where a private individual was on trial for the commission of an offense, and where his only defense was that the law under which he had been indicted had been repealed, the court held the plea to be good and allowed this man to go unwhipped of justice because sec. 3201 had "most wisely abolished" the leasing system; and the court went further still and said that the whole subject of the penitentiary convicts and the authority to provide for and control them had been vested in a board of control, thereby giving judicial sanction and full force to the very section which is now here assailed. It is manifest that, if sec. 3201 be uncon-

stitutional (and if unconstitutional now, it was unconstitutional in 1895), the opinion in that cause proceeded on an erroneous theory. A subject is certainly not "revised and reënacted," in the purview and meaning of Code 1892, § 3, if the chief provisions dealing therewith are themselves repugnant to the constitution. This question lay at the very threshold of the investigation in that case, and it cannot be said, without exciting a smile of ridicule from the profession, that the organ of the court in that case, that great jurist the search light of whose genius illumines every subject it touches, could possibly have overlooked a question which towered like a mountain in a desert landscape. In the face of that solemn declaration by this court, to now hold the very law, there upheld as of unquestioned validity, to be unconstitutional, would, in my judgment, operate to cast discredit upon the deliberations of this court and to weaken the confidence and respect of the people in its adjudications. To ignore the decision would be to furnish a striking instance of a case where, the mountain refusing to move, Mahomet calmly walks around it.

In addition to these considerations we must also note the practical construction placed upon the constitutional provisions by the departmental officers of the government. Since by the adoption of sec. 275 of the schedule to the constitution all laws repugnant to the constitutional provisions treating of the penitentiary and convicts were repealed, four governors have graced the chair of chief executive of this state: Stone, McLaurin, Longino, and Vardaman—names illustrious in the history of this commonwealth. Each of these statesmen in the discharge of official duty was called on to pass on the validity of contracts made by the board of control, leases of farms to be worked with convicts on shares, either by approving statute laws tacitly acquiescing in or expressly recognizing the existence of such contracts, or, as chairman of the board of control, by affixing his official signature to the contracts. No of-

ficial duty is more pressing upon a chief executive than to withhold his approval from any act when convinced of its unconstitutionality. Cooley's Const. Lim., p. 76. And yet up to the institution of the present proceeding no governor has refused his approval. Since the inauguration of the constitutional method referred to, five men, each eminent in the legal profession, have filled the office of attorney-general: Miller, Johnston, Nash, McClurg, and Williams. In the discharge of their official duties as chief law officer of the state, it devolved upon each of them to prepare, scrutinize, and approve all contracts to which the state in its sovereign capacity was party. Code 1892, § 186. Each of these, without exception, has voiced his interpretation of the constitution by his approval of the contracts. The official history of the state shows that the state auditors, who have ever been vigilant in the discharge of the duties intrusted to them, and who have never hesitated to refuse to issue warrant where the appropriation had even the semblance of unconstitutionality and to invoke the judgment of the judicial tribunals of the state before permitting a payment the validity of which they doubted, have year after year, without doubt or hesitancy, issued warrants for money expended in the maintenance and operation of farms leased by the board of control and worked with convict labor. The several boards of control, which have come into and passed out of existence with changing membership, have year after year followed the footsteps of their predecessors and made annual leases of varying numbers of farms. When we consider, therefore, the uniform construction which has been placed upon the provisions, we should not, in the language of the supreme court of the United States, vary it at this late day, except for most cogent reasons.

We are told, and correctly so, that contemporaneous legislative construction and the practical interpretation of departmental officers, while entitled to great force and respect, so as to be conclusive upon the courts in cases of doubtful or ambiguous wording, cannot control the decisions of courts where the lan-

guage is plain and the violation thereof palpable; and this is true, but can it be contended in the instant case that the language of the constitution is so free from doubt as to convince every one, upon a fair consideration of its terms, of the incorrectness of the interpretation heretofore placed on it? On the contrary, I affirm that from an analysis of the constitution itself, when scrutinized in the light of accepted canons of construction and giving the language its usual and accepted signification, it is demonstrable that the previously accepted interpretation is correct. The tests to be applied in ascertaining the intent of the framers of a written instrument like the constitution are tersely stated as follows: What was the old law? What was the evil? What was the remedy? The old law permitted the hiring of convicts to private individuals, and when so hired they were worked under private supervision upon railroads, levees, farms, and public or private works, according to the varying business occupations of the respective contractors. The evil was the cruelties and inhumanities which it was alleged disgraced that system, owing to the greed and cupidity of heartless masters, who would drive the convicts beyond the physical power of endurance. This was the condition of affairs, as the public history of the state recites, which existed when the constitutional convention met. For this shameful and pitiable condition a remedy was needed, the constitutional convention was vested with plenary power in the premises, and it was a question simply of judgment as to what method should be adopted. The evil was the inhuman treatment of the convicts, which, if true, as alleged, was a disgrace to the state and a blot upon civilization. The remedy applied was to withdraw the management of the convicts from private hands and retain it entirely under the supervision of the state, through its chosen officers and employes.

It will, I apprehend, fall as a distinct shock on the ear of the humanity-loving people of the state to hear the statement sol-

emnly made that the framers of the constitution, in inaugurating the scheme prohibiting the hiring of convicts, were not moved by the God-given spirit of mercy to protect the unfortunate criminal from brutality and oppression, but by the petty, pitiful, sordid design of precluding the possibility of the labor to which the convicts for their punishment and the good of society are sentenced proving of benefit to any private citizen. I earnestly and emphatically repudiate the suggestion. Clothed in sophistry, partially concealed by the flowers of rhetoric, though it may be, the idea is an unwarranted aspersion of the motives of the broad-minded, patriotic statesmen who composed the membership of the constitutional convention. Says Gov. Stone in his biennial message hereinbefore referred to: "The policy of the state, as clearly defined by the constitution, is to retain all state convicts within and under state supervision." And to speedily effectuate that policy he recommended the wisdom of the immediate establishment of penitentiary farms, admitting, however, in the same message, that the solution of the problem had been by the constitutional convention submitted to the legislature.

Section 223 of the constitution provides: "No penitentiary convicts shall ever be leased or hired to any person or persons, or corporations, private or public or *quasi* public, or board, after December the thirty-first, A.D. 1894, save as authorized in the next section, nor shall any previous leasing or hiring of convicts extend beyond that date; and the legislature shall abandon the system of such leasing or hiring as much sooner than the date mentioned as may be consistent with the economic safety of the state." And sec. 224, while permitting the legislature to authorize the employment of convicts "under state supervision and the proper officers and employes of the state" on certain public works, also places certain limitations upon the power of the legislature in this regard, by stipulating that such working of convicts on public works should never "inter-

fere with the preparation for or the cultivation of any crop which it may be intended shall be cultivated by the said convicts, nor interfere with the good management of the state farm, nor put the state to any expense." This plainly shows that it was not the character of labor in which the convicts had been previously employed which was condemned, but rather the method in which they had been worked. To make this perfectly manifest, it is only necessary to direct attention to the fact that every kind of labor in which the convicts had been employed previous to the adoption of the constitution was by the constitution recognized as legitimate and the legislature expressly empowered to have the convicts worked in any one of those modes. Prior to the adoption of the constitution, under the existing laws, convicts could lawfully be worked on levees, railroads, and other public works or on farms. The constitution expressly permits the legislature to have them worked in each of these particular ways, naming them specifically; and to show that the employment of the convicts in agricultural pursuits was not intended to be restricted in any degree, the constitution encourages and favors the plan of working them in crops by providing that none of the other methods permitted "should interfere with the preparation for or the cultivation of any crop which it may be intended shall be cultivated by the said convicts." Certainly it must be admitted, then, that, as before stated, the evil which was sought to be remedied arose out of the private hiring of convicts, and not the working of them upon farms; and the remedy applied was, not to change the kind of manual labor in which they could lawfully be employed, but to have that labor controlled exclusively by the officers and employes of the state. The evil was not the kind of work done, but the way the convicts were treated.

The attempt is made to construe the expression "leasing or hiring of the convicts," as used in the constitution, as being synonymous with "leasing of farms to be worked by the con-

victs." How futile such an effort is will be apparent when we recall that at the adoption of the constitution there was in existence no system of leasing farms, and hence it was impossible that the constitutional convention could have dealt with a situation which had never arisen. We have shown that the plain distinction between hiring of convicts and leasing of lands to be worked by convicts has uniformly been recognized and adhered to by the officers of the government in the administration of their different departments. We have shown that the supreme court of the state, by an adjudication rendered in 1895, when the system of leasing farms was at its very zenith, decided in express words "that the system of leasing had been wisely abolished;" and yet, at the very time when that opinion was pronounced, it was well known, unless the supreme court can plead ignorance of what is known to every informed citizen of the state, that much the larger proportion of the convicts were employed upon leased farms. But the distinction is also recognized in the constitution itself, where it provides: "The legislature shall abandon the system of such leasing or hiring as much sooner than the date mentioned as may be consistent with the economic safety of the state." "Abandon" means to give up absolutely, to forsake entirely. Can it be said that the constitutional convention means that the legislature should "abandon" what had never existed? "Shall abandon the system of such leasing or hiring," says the constitution. Can the terms "such leasing or hiring" relate to anything except that the system of hiring then in force should, on account of its manifold evils, be abandoned, and that, while the convicts might still lawfully be worked in the same classes of work, it should only be with proper safeguards of governmental supervision to prevent a repetition of cruelties and horrors which had shocked the conscience and moral sensibility of the commonwealth? The words "under state supervision exclusively" are the keynote to the true interpretation of the entire article of the constitution. It is the strand which,

once found, the tangled skein readily unwinds. Keeping this expression in mind and this object as the paramount purpose of the convention, all difficulties disappear, and it is not necessary to resort to that practice condemned by Mr. Jefferson, and attempt to "squeeze out" of the constitution a strained construction to meet private views. Any other construction will run counter to the plain intendment of the law, nullify the ordinances of the convention, uproot the uniform practical departmental construction, and overthrow the solemn adjudication of this court—a step not lightly to be taken. I hold, therefore, that sec. 3201 was a valid exercise of legislative power.

But it is said that Code 1892, § 3201, even if valid at the time of its enactment, cannot subsist without destroying subsequent legislation upon this question. Acts 1894, ch. 75, p. 65, is referred to as warrant for that position. But it must be observed that, while the act in question does provide for the purchase and establishment of a penitentiary farm, and does impose upon the board of control the duty "as soon as practicable with the available means and force at their command" to "erect necessary buildings and walls for the safe-keeping and working of the convicts," also in the very next section the act provides that, if the board should "determine that all the convicts cannot be profitably worked on the lands and in industrial pursuits connected therewith, they are authorized to employ such convicts as cannot be used in such manner, not prohibited by the constitution, as may be deemed most advisable and to the best interests of the state, but shall never part with their control and management;" thus recognizing the power of the board to work the convicts in any manner not prohibited by the constitution, expressly clothing the board with discretion as to their employment, and again emphasizing the dominant idea of the constitution that the convicts should be worked "under state supervision exclusively." It should also be noted, as tending to show the purpose of the legislature in adopting the act of 1894, that the official journal (house

journal 162) shows that an attempt was made by amendment to impose certain limitations upon the power of the board of control to dispose of the excess of the convicts not used on the state farm. The attempt failed, and the law was adopted as it stands, granting the board of control authority to work the convicts not used on the state farm in any manner "not prohibited by the constitution." The language of this provision was deliberately chosen, and the statute was adopted in full knowledge of and without repealing or in any wise modifying Code 1892, § 3201, which had been adopted by the same legislature at its previous session, and which expressly clothed the board with power to lease farms for the employment of the convicts and recognized that as a constitutional system of working them. Fairly read, in view of the plain meaning of the constitution, the act of 1894 utterly destroys the contention that the board of control was not vested with absolute control and power to direct the management of the convicts. Especially is this true if we recall that this court, in *Jenkins* v. *State, supra*—decided after the adoption of this statute—expressly declared that the board of control was vested with power to control and direct the employment of convicts, and the statute referred to (sec. 3201) expressly authorized and was the exclusive warrant for the leasing of farms to be worked by convict labor. And it is significant that the leasing system now in vogue was never inaugurated until after the passage of the act of 1894, which it is now contended prohibited it and repealed the law authorizing it, the first farms leased being, as shown by official records, in 1895. It is of peculiar significance, too, that the system of working private farms with convict labor was instituted by the board of control during the administration of Gov. John M. Stone, one of our most eminent statesmen, and Attorney-General Frank Johnston, one of our profoundest jurists, both of whom were *ex officio* members of the board of control.

Again, it is said if the statute last referred to did not oper-
ate as a repeal of sec. 3201, then Acts 1900, ch. 56, p. 63, did
have that effect. But here, too, it must be observed that, while
the intent of the legislature is evident that the board of control
should at once proceed to properly prepare the lands acquired
in pursuance of that act for the use and occupancy of the
convicts, the manner in which the land was to be cleared and
opened for cultivation was necessarily left to the discretion
and judgment of the board. It is true that by sec. 6 (p. 66)
of the act a proviso is made that it shall not affect or impair
any previous contract for the renting or leasing of lands, but
that the same should be executed as theretofore contracted.
That this, while effectually disposing of the contention. that
there was ever any doubt as to the validity of such leasing
contracts, does not carry with it even the implied meaning
that such contracts should not be renewed after the year 1900,
is apparent from Acts 1902, ch. 57, p. 54, enacted by the same
legislature, which recognized that the state was working at
that time farms on the "lease or share system" and dealt with
the money which was in the future to accrue from that source.
In the very nature of things, such a proviso would have been
unwise and would have hampered the board of control in pro-
curing suitable lands to be devoted to the establishment of a
permanent penitentiary farm. The board of control was given
a reasonable time to make the purchase; was required to pur-
chase a certain quantity of land, all woodland, or part cleared
and part woodland; was to advertise for offers to sell; was to
visit and carefully inspect the lands, and an option was to be
taken thereon for at least sixty days; further, that the selec-
tion, when made, was to be submitted to the approval of the
governor and the attorney-general, and, after that was done,
the abstract of title was to be furnished by the seller and ap-
proved by the attorney-general. And when all these formalities
had been complied with, necessarily consuming much time in

their completion, then the section provides, in order to place the power and discretion of the board beyond reasonable cavil and disputation, that "said land when purchased shall be occupied as soon as practicable by the board of control with as many convicts as may be necessary to occupy the land." The number of convicts needed to occupy the land would, of course, depend on the proportion of cleared land to woodland. Who was to decide how many convicts would be necessary to occupy and manage the land? Who was to decide what disposition was to be made of the excess of the convicts which could not conveniently be worked on the land? The answer to each inquiry must be: The board of control.

Finally, in this connection, it is not amiss to note that the present legislature at its last session had its attention specially directed to the fact that the system of cultivating leased farms with convict labor was still in vogue. The retiring governor in his message spoke of the manner in which the convict labor had been utilized in the past, was then being used, and foreshadowed the policy of the board of control in the future, in the following language, which is quoted from that message: "The board of control is, and has been, of the opinion that the hasty concentration of the prisoners from leased property to the new lands would, for obvious reasons, endanger the financial success of the penitentiary. In other words, to secure with more certainty the self-sustaining capacity of the prisoners, the board has thought it best not to discontinue at once all leases, but to gradually work away from them by putting the prisoners on the state's property as the land would be cleared and made ready for them without curtailing other farming operations." Differing with the policy thus forecast, but recognizing the power and discretion of the board of control in the premises and the validity of the leases which might be made, a bill was introduced (house bill 558) absolutely prohibiting the working of convicts on lands not owned by the state.

This bill, though passed by one house, failed to become a law. It is, however, sufficient to show that the power of the board to lease lands was not denied; for, of course, no one would venture to assert that the present legislature would be guilty of the folly of passing a law to prohibit an act if, as a matter of fact and of law, the act condemned was already forbidden by the organic law of the state. Such an assertion would be an imputation upon their intelligence. If, then, the board of control was vested with this discretion, by what rule of law, in the absence of gross abuse of discretion or official misconduct or corruption, can any court undertake to substitute its judicial determination for the judgment of a board vested with full power in the premises? It cannot be done. As said by this court in *Monroe County* v. *Strong*, 78 Miss., 570 (29 South. Rep., 530): "Courts will not interfere with boards of supervisors in the lawful exercise of the jurisdiction committed to them by law, on the sole ground that their actions are characterized by lack of wisdom or sound discretion." And in *Rotenberry* v. *County*, 67 Miss., 471 (7 South. Rep., 211), it is said: "Looking at the entire case, we see nothing but the question of the jurisdiction of a court of chancery over the lawful exercise of the powers belonging, under our constitution and laws, to the boards of supervisors exclusively. The power of the board of supervisors over courthouses and sites for courthouses is complete and exclusive in this state, and no interference with the exercise of this power by the chancery courts can be upheld so long as the power is alleged to be only exercised unwisely and without discretion. . . . For, if the board is exercising the powers confided exclusively to its jurisdiction by our constitution and laws, the want of proper discretion and sound judgment in the board in so exercising its functions can never warrant an invasion of its jurisdiction by another tribunal, whose discretion and judgment touching the exercise of the powers committed to and conferred upon the board may not be har-

monious with the mere discretion and judgment of such board.
Granting the exclusive power in the board of supervisors over
the subject-matter of this controversy, it must follow that
the exercise of the power must rest, likewise exclusively, in the
discretion of the tribunal clothed with the power." If this
rule of law applies to boards of supervisors which are vested
with control over certain matters, "to be exercised in accord-
ance with such regulations as the legislature may prescribe,"
how can a different rule be invoked to justify a judicial in-
vasion of the powers of another board vested by legislative
authority with power and control over certain other matters?
It cannot be done without violating well-recognized, and until
this time undoubted, principles of elementary and fundamental
law. The case of *Simpson County* v. *Buckley*, 85 Miss., 713
(38 South. Rep., 104), is no authority to the contrary for two
plain reasons: There the existence of certain facts was a con-
dition precedent to the exercise of any jurisdiction by the
board over the subject-matter; here full control is given by ex-
press legislative enactment. There the facts vitiating the action
appeared on the face of the record itself; here on the face of
the record the action appears valid. I conclude, therefore, that
sec. 3201 is constitutional and is unrepealed; that the chan-
cery court is without jurisdiction by injunction to control the
discretion of a governmental executive board, even though its
action was "characterized by lack of wisdom and sound dis-
cretion," there being no charge of corruption or official mis-
conduct; that the contract in this case was intended to be, and
is, a lease of land; that the board of control had the legal right
to make such a lease, if fairly entered into, it being within the
scope of its legitimate powers; that, conceding the general
jurisdiction of the chancery court, it was improperly exercised
in the instant case, because the contract under review contra-
venes no provision of the constitution or statute. Hence the
injunction was improvidently granted and should be dissolved.

But it is urged the amended bill charges that the contract is illegal, because it is practicable to work all the convicts on the state farm profitably, and certain general statements are made showing from what this conclusion is drawn. This presents a question, to my mind, of great importance and gravest doubt. As recited in the amended bill, a mere general averment, I have no hesitancy in saying the allegations are not sufficiently specific to require a reply. But if, as suggested, the bill intends to charge (and those intentions be carried out by amendment) that the state has land already cleared and ready for cultivation sufficient to demand and require the labor of all the convicts for its proper working, and that there is land suitable for cultivation, and not needed for timber, ready for clearing, and that all the convicts are needed and it is practicable and necessary to employ them all for the occupancy and management of the state farm, and that the board of control acted with full knowledge of these conditions, and these charges be sustained by proof, then I am not prepared to hold, and do not hold, that a court of chancery would be powerless to order the contract annulled, though made by the board of control. Acts 1900, ch. 56, p. 63, is mandatory that the state farm thereby provided for shall be occupied as soon as practicable by as many convicts as may be necessary to occupy and manage the same. Undoubtedly this vests large discretion in the board; but if it be true, as intimated in the bill and argument, that the board of control knowingly intends to permit the cleared land of the state to lie idle and go uncultivated, and lands suitable for cultivation and which could advantageously be cleared to remain uncleared, while the convicts are worked on the lands of private owners, then such action, knowingly (and, if knowingly, corruptly) taken, would amount to gross abuse of a power and discretion, for which it might be, upon proper proof, the state would have a remedy by a cancellation of the contract, because beyond the legitimate scope of the power of the board.

Personally I think these charges, upon being made specific, would be sufficient to justify the retention of the bill for proof. However, I yield my views on this point to the judgment of the chief justice, who granted the injunction, that the allegations were not intended to cast doubt or suspicion on the good faith of the board of control, and that the only point presented by either the sworn or amended bill is the power of the board to make this contract. Being absolutely assured on this question, I for this reason concur in the result, which reverses the case and dismisses the bill.

Ordinarily I might content myself with a bare statement of my special concurrence in the conclusion reached by my associate, Judge Calhoon; but the importance of the case, the gravity of the issues involved, and other attendant circumstances not necessary to recite, all admonish me that a failure to express my views would be, in this instance, a failure of duty. In response, therefore, to the request of the state officials concerned, I have set out fully and frankly my conclusions on every important legal question involved herein. They are in harmony with the views heretofore expressed and the course heretofore uniformly followed by every state official whose duties connected him with the matter; they are supported by the interpretation placed on the constitution by the framers thereof as voiced in solemn ordinance; they are strengthened by the construction of the code commissioners, indorsed by the wisdom of the legislature, and confirmed by the solemn adjudication of this court. This unanimous concurrence of the past, rendered calmly and in deliberate discharge of official and judicial duty, joined to my own solemn convictions, removes from my mind the last vestige of doubt as to their correctness.

For the reasons stated, I concur in the conclusion that the case should be reversed and bill dismissed.

WHITFIELD, C. J., delivered the following dissenting opinion:

The first essential to a precise and accurate understanding of the exact points at issue in this cause is to have a clear comprehension of the exact case made by the bill. The substantial averments make by the bill are as follows:

"Second—The original bill was prepared and filed before the order of the board of control had been entered and upon the information that the board of control of the penitentiary had voted to make a contract with H. J. McLaurin leasing his Sandy Bayou plantation, in Sharkey county, from him for the year 1906, for the purpose of working the state convicts upon the same for the benefit of the state. . . .

"Fourth—Your orator now states that when the order of the board of control was drawn and entered upon its minutes on December 5, 1905, it was, and is, in legal effect, an order for a contract by which the said McLaurin was to pay the state $25,000 for the hire and labor of the state convicts necessary for the cultivation of said plantation for the year 1906, the number of said convicts to average seventy for the year.

"Fifth—A copy of said order is filed with this amended and supplemental bill as exhibit A, and prayed to be taken and considered as a part of this bill. This action was taken over the protest and against the vote of the governor, and was passed by the following vote of three for and two against: those voting for the order being William Williams, R. L. Bradley, and J. C. Kincannon, and those voting against being J. K. Vardaman and S. D. McNair.

"Sixth—Thereupon, on December 5, 1905, three members of the board of control—viz., R. L. Bradley, William Williams, and S. D. McNair—signed, as members of said board, a contract drawn in pursuance of said order, and the same was signed at the same time by H. J. McLaurin. Said contract provides for the working of an average of seventy of the state convicts,

for the year 1906, on said H. J. McLaurin's Sandy Bayou plantation, for the price of $25,000. H. J. McLaurin, it is provided by the contract, is to provide and maintain the mules and teams on the plantation and provide all necessary planting seed, farming implements, and wagons, and is to have all of the crop after the payment to the state of the fixed sum of $25,000 for the labor of the convicts. A copy of said contract is filed as exhibit B, and is prayed to be taken and considered as a part of this amended and supplemental bill.

"Seventh—The governor of the state is advised, and accordingly submits unto your honor, that said contract, in legal operation and effect and aside from its phraseology, is a contract leasing an average of seventy of the state convicts to H. J. McLaurin for the gross sum of $25,000 for the year 1906, and out of which the state is to maintain, feed, clothe, guard, and care for said convicts. But whether it is a contract by leasing or hiring these convicts or a contract for the renting of Sandy Bayou plantation, the governor of the state is advised, believes, and charges that this action of the board in making said order, and the action of the three members of the board of control who signed said contract, is violative of the constitution and statutes of the state touching the employment and disposition of convicts of the penitentiary, and that the members of the board and the warden and H. J. McLaurin should be enjoined from executing such order and from forming said contract made in pursuance of said order; and so impressed is he with this conviction, that this action of the board is unlawful and violative alike of the letter and the spirit of the constitution and statutes of the state, that he has directed this suit for and in behalf of the state to invoke a judicial decision of said question and to restrain said legal action. The governor is further advised, and now respectfully submits to your honor, that the state is entitled to have a decree made by this honorable court for the delivery up by the defendants of said contract and for

a decree for the cancellation of both the said contract and the order of the board, and that pending this suit the injunction granted as aforesaid should be retained.  .  .  .

"Ninth—This leasing was seen to be an evil, and in 1894 the legislature provided for the purchase of state farms; but it provided that the convicts should carry on, in connection with the farms, industrial pursuits; and sec. 5 authorizes the board to employ such convicts as 'could not be profitably worked on such lands and industrial pursuits connected therewith in any manner not prohibited by the constitution and to the best interests of the state.'  Pursuant to this act, the board bought three large plantations, and in 1900 owned the Rankin farm, in Rankin county, consisting of 3,100 acres; the Oakley farm, in Hinds county, of 2,700 acres; and the Belmont farm, in Holmes county, consisting of 2,080 acres.  Notwithstanding the ownership of said large places, the board, acting with a mistaken view of its powers, continued to lease certain farms on the idea that those owned by the state did not furnish enough employment for all the convicts.

"Tenth—This course being deemed an evil by the legislature, the act of 1900 was enacted, providing for the purchase of an additional farm or farms, to comprise not less than 8,000 nor more than 15,000 acres.  This act contemplated that the lands purchased might be uncleared, and it was therefore provided in sec. 2 that they should 'be occupied as soon as practicable by the board of control with as many convicts as may be necessary to occupy and manage the same,' and in sec. 4 it was required that the lands 'shall be opened up for cultivation as rapidly as practicable.'  Said act did not authorize the leasing of lands, but clearly contemplated that there should be no further leasing, and as the lands were able to furnish employment at a profit for all the convicts, the further leasing was by clear implication prohibited.  Section 6 of the act declared that it should not affect contracts for leasing of lands for the year

1900, thus clearly evidencing the purpose to prevent leasing after that year. The Sunflower place was then purchased, consisting of 13,899 acres.

"Eleventh—Complainant states and charges that the action of the board of control in attempting to make this contract for working the Sandy Bayou place is illegal because such a contract is altogether prohibited; but if complainant be mistaken in this view, then it is illegal because all the convicts of the penitentiary can be profitably employed on the state farms. There is ample land in cultivation on said farms to give profitable employment to all the convicts in cultivating, ditching and draining them, and, if these will not, there are thousands of acres of valuable land not needed for timber, but to be opened for cultivation; and as the board is required to open said lands as rapidly as practicable, the board cannot legally refuse to so employ the convicts. In any view, the only condition on which the board could ever be deemed to have such power is that all the convicts cannot be profitably employed on said farms in cultivating and opening them or in industrial pursuits, as required by law. This condition does and did not exist. Complainant states further that said contract interferes with the preparation and cultivation of crops on the state lands, and will necessarily cause an illegal expenditure of the state's finances, and interferes with the good management of the state's farms, and is in violation of sec. 224 of the constitution, and it retards the opening up of the uncleared land on the state's farms, and is in violation in this respect of the act of 1900.

"Twelfth—The attorney-general of the state, as a member of the board of control, favored and voted for said lease, and, in view of the provisions of law as to his duty to prosecute actions and suits for the state, he is not joined as a defendant therein.

"Thirteenth—The governor, acting under the powers given him by the constitution and laws, and specially the powers con-

ferred by Code 1892, § 2156, has directed this suit to be brought.

"Fourteenth—Since the filing of the original bill, the board of control has met, and, all being present, unanimously passed an order (filed as exhibit C herewith) asking the courts to speedily pass on the question of the validity of said contract, the obvious intent being that all technical questions and questions of procedure be waived and the power of the board to make the contract be speedily passed on. Complainant joins in this request."

### *Exhibit A to the Amended and Supplemental Bill.*

"*Resolved,* That the board of control work with the convicts, for the year 1906, Sandy Bayou plantation, owned by H. J. McLaurin, and shall receive for their share of the crop and for the labor of the convicts $25,000.00 (twenty-five thousand dollars), which sum the said McLaurin guarantees to the state certain and in all events for said year; the number of convicts to be employed on same to average seventy (70), if so many may be necessary to the proper cultivation and harvesting of the crop thereon."

### *Exhibit C.*

"*Resolved* by the board of control as follows—to wit: First —That a contract has been made and entered into at this term of the board, by and between the said board of control, acting for and on behalf of the state of Mississippi, and H. J. McLaurin, which said contract is in the following words and figures—to wit:

"'JACKSON, MISS., Dec. 5, 1905.

"'This contract, made and entered into on the date above written, by and between the state of Mississippi, acting through and by the board of control of the state penitentiary of said state, and H. J. McLaurin, witnesseth:

" 'First—That the board of control has agreed to work the plantation in Sharkey county, state of Mississippi, owned by said McLaurin and known as "Sandy Bayou," for the year 1906.

" 'Second—That said board of control shall pay to the said McLaurin, for the use of said plantation for said year, all the crops grown, raised, and gathered on the said premises for said year, after the sum of twenty-five thousand dollars ($25,000) shall have been reserved therefrom; and the said McLaurin guarantees that the said crops raised on the said premises shall amount to $25,000.00, and binds himself to the said board of control in that sum, promising to make up whatever the crops grown on the said premises may fall short of that amount.

" 'Third—That the said board of control shall have absolute authority over the labor employed in working the said lands, and said labor shall be under the direction of the said board of control and of the persons appointed by the board.

" 'Fourth—That the said McLaurin, in addition to the land leased and furnished by him, shall also furnish the necessary mules and teams for the working of said plantation, and feed for same, and shall also furnish all wagons and farming implements and planting seed.

" 'Fifth—The said board of control shall have said crops made, harvested, and gathered. This act executed in duplicate.

" '—— —— ————,
" '*President of the Board of Control;*
" 'R. L. BRADLEY,
" 'WM. WILLIAMS,
" 'S. D. McNAIR,
" '*Members of the Board of Control;*
" 'H. J. McLAURIN.' "

These are the averments of the bill, and the case, to put it in plain, intelligible language, made by this bill is simply this: That the board of control, acting by a majority of three to two,

has made and completed a contract the provisions of which are
in flagrant violation of the constitution of the state and of the
statute law of the state.   There is no question in this record
of any willfulness or fraud on the part of the board of con-
trol.   No such charge has been made, or argued, or hinted at.
The charge is plainly and simply that the board transcended
its power in making the contract.   Such are the averments of
the bill, such the case made by the bill.   The injunction did not
seek to control, or to direct, any discretion lodged in the board
of control.   It did not restrain the board of control from voting
as they pleased.   It did not in the slightest degree seek to di-
rect them how to vote.   The governor, acting as the represent-
ative of the state, properly waited until the board of control
had done all it could do in the premises—to wit: make the con-
tract.   The act was completed, absolutely consummated; noth-
ing more was left to be done.   But just at that point, where the
contract was perfectly made, and prior to any step taken in ex-
ecution of the contract, the governor, acting as the representa-
tive of the state, intervened by injunction, not to control any
discretion in the board, as above plainly shown, not to keep them
from voting, nor yet to direct them how to vote, nor to control
or guide their discretion in voting or acting, but simply to pre-
vent them and McLaurin from executing—from carrying into
effect—the contract already perfectly made between the board
and McLaurin.   The precise and exact thing which the injunc-
tion sought to accomplish was to arrest and nullify the con-
tract already made, as an absolutely null and void contract, on
the ground that it was one entirely transcending the power of
the board of control to make, either under the constitution or
the statutes in force at the time of the making of the contract.
In other words, to put it shortly and plainly, the object was
to test the legality of this contract.   To show that the board
of control itself so understood the injunction, and clearly appre-
hended the plain fact that no discretion of theirs was sought

to be interfered with, the board of control itself passed a reso-
lution, a copy of which was immediately transmitted to this
court, as well as to the court below, expressly calling on both
courts to decide promptly the question as to the legality of this
contract which is made an exhibit to the bill.

It is made perfectly clear that the contract was completely
made, and that both the governor, for the state, and the board of
control, on its own behalf, had requested this court to pass upon
the legality of this contract. And, further, it will be noted that
the prayer of the bill is that the contract be delivered up for
cancellation. The letter of the governor, employing counsel, is
as follows:

"December 5, 1905. Messrs. Alexander & Alexander, Jack-
son, Miss.—Gentlemen: I wish, in behalf of the state of Mis-
sissippi and in its name, to have suit brought to enjoin the ex-
ecution of any order of the board of control looking to leas-
ing any farms for the coming year; and, believing that the
interests of the state require it, I hereby retain your firm to
assist in the case or cases to be brought for that purpose. Yours
respectfully, Jas. K. Vardaman, Governor."

A demurrer to the amended bill was filed, being the same as
the demurrer to the original bill in substance, and a motion to
dissolve the injunction was made. Upon hearing, the chan-
cellor overruled the demurrer and the motion to dissolve, and
retained the injunction, filing an opinion which the reporter
will set out in full as part of the record in this cause. It will
thus be seen that the governor in the bill, and the board of con-
trol in their written request to this court and to the chancellor,
both joined in earnestly requesting this court to pass upon the
one essential thing contained in this record—to wit: the legality
of this contract. It will further be seen from the letter of the
governor, as well as from the averments of the bill and the lan-
guage of the prayer, that the injunction did not in the slightest
degree seek to prevent the board from voting as they pleased

or in making the contract, which would have been an effort to control their discretion, but simply and solely sought to restrain the execution of the contract, already completely made, on the ground that it violated the constitution and the statute law of the land, transcending the power of the board of control, which was a perfectly proper exercise of the injunctive power of the court. The board of control knew perfectly well that they had not been kept from voting; that they had been permitted to vote just as they pleased; that no effort had been made by this bill to control their discretion in voting. Indeed, since the injunction was expressly limited on its face to preventing the execution of the contract—that expressly, and nothing more—and since, as shown by the resolution adopted by the board, they had already made the contract, had already acted, had already voted, had already exercised fully any discretion committed to them, how is it anything but an unthinkable proposition that an injunction, if issued after all this, after the accomplished fact, could possibly have had any effect on the making of a contract already fully made? I have been thus precise and exact in the statement of just the effect and scope of this injunction because, the chancellor being absent from the city and the emergency pressing, I was called upon, according to the statute, to give the injunction, and I do not intend that the real ground for issuing it shall be misunderstood, and because, when once the exact scope and effect of the injunction is understood clearly, all confusion of thought growing out of the legal proposition that the chancery court had no power to control or guide the discretion of the board is plainly seen to be thoroughly removed from the case. Let us put it in the form of questions and see if that does not clarify the situation.

First, can the chancery court by injunction control or direct the exercise of discretion on the part of the board of control as to whether or not it would make this contract? Most mani-

festly not. The proposition that chancery courts have no juris-
diction by injunction to control or direct discretion vested in
the board of control or any like board is too plain to need the
citation of a solitary authority. It is elementary learning,
about which there can possibly be no dispute. But when the
board of control had exercised all the discretion it had about
whether it could make this contract, and had actually voted
to make it, and had completely made it, so that it had exhausted
its discretion as to the matter of making this contract uninter-
fered with by the court, then, if that contract so made is one
which by its terms plainly and palpably violates the constitu-
tion of the state and the statute law of the state, cannot the
chancery court, by injunction, prevent the mere execution of
it, the mere carrying into effect of this void contract? Most in-
disputably it can. And this, too, is a question about which there
can be no possible dispute; it, too, is elementary learning.
In other words, whilst the court cannot interfere with the ac-
tion of the board in making the contract, cannot control its dis-
cretion in voting to make it, nevertheless, when that contract has
been made, all the discretion the board has as to the making of
the contract has been fully exhausted; and if that contract is
violative of the constitution and law, the chancery court can
enjoin the execution of that null and void contract, just as it
could stop the enforcement of any other contract violative of the
law of the land. If it were otherwise, we should be confronted
with the astounding proposition that a sovereign state could
not restrain the execution of any contract, no matter what the
contract might be, no matter how absolutely null and void, no
matter how plainly and palpably violative of the law of the
land—the constitution supreme over every department of the
state government—simply because, and only because, a ma-
jority of the board of control had made such contract. I cer-
tainly shall not waste time in trying to make plain the utter in-
defensibleness and extravagance of such pretension. Innumer-

able authorities sustain this elementary proposition, and point out clearly the distinction, everywhere obtaining, between the power of the chancery court to control or direct the discretion of an inferior board in making a contract, and its power, wholly different, to enjoin and restrain the execution of an illegal contract after it has been made. I cite a few among a multitude: *Davis* v. *Gray,* 16 Wall., 203 (21 L. ed.; 447); *Stevens* v. *St. Mary's School* (Ill.), 32 N. E., 962 (18 L. R. A., 835; 36 Am. St. Rep., 438); *Crampton* v. *Zabriskie,* 101 U. S., 601 (25 L. ed., 1070); *Wisconsin* v. *Cunningham* (Wis.), 51 N. W., 724 (15 L. R. A., 561); *State* v. *Saline County,* 51 Mo., 350 (11 Am. St. Rep., 454); *State* v. *McLaughlin,* 15 Kan., 228 (22 Am. St. Rep., 264); High on Injunctions (3d ed.), p. 32.

The argument made here by the learned counsel for appellant for the exemption of the board of control from the power of the chancery court to make it conform in its contracts to the constitution and laws of the state, followed to its logical conclusion, would result in boundless confusion and utter anarchy. The board of control is dealt with, by this line of argument, as if it were omnipotent. One would suppose that it had some divine patent of impeccability. It is as if some minor star, which had hitherto eluded all telescopic search, had suddenly been discovered, all at once, describing about us the orbit of Saturn with the splendor of Sirius, in the dazzling glory of whose beams governor, legislature, supreme court, constitution, one and all alike, "pale their ineffectual fires." I speak, of course, not of the *personnel* of the board of control. I am not dealing with individuals, but with principles. Boards of control come and go; but the eternal principles which make the constitution, which set it apart as a holy thing, to be implicitly obeyed and universally revered, which place it far above the clamor and passion of the passing hour, high over every department of government—these principles, I trust, are to remain forever. The proper subordination to the constitution,

the faithful, instant obedience due according to the different
gradations in the different agencies of government to the con-
stitution, is as essential to the very existence of republican
government as the atmosphere we breathe is to the support of
animal life. The spirit of the constitution is as "broad and
casing as the general air." It is the essential oil in which the
machinery of government moves. "Vital in every part, it can-
not, but by annihilation, die." It is the ark of the covenant of
our liberties, our property, and our lives. It is the last and
sure refuge—as expounded by this court, the ultimate inter-
preter of the constitution—for every citizen, great and small,
within the limits of the commonwealth. So long as it is thus
respected and obeyed, we shall have liberty regulated by law.
When we announce the doctrine from this bench that a subordi-
nate board of control—a mere creature of legislative enactment,
made by the breath of the legislature, and by that breath liable
to be at any time unmade—unknown to the constitution, can
violate the fundamental law, the constitution, by a contract
plainly and palpably outraging its provisions and its spirit and
policy, and that such contract, unconstitutional, violative of
the statute, null, and void, absolutely, cannot be set aside and
abrogated by the judicial power of the state, we have established
a precedent just as sure to return to plague us as the rising of
the morrow's sun is sure.

But it is said that the governor of this state has no power
to even initiate litigation, where the matters are *publici juris,*
too, where the interests of the entire people of this common-
wealth are involved, where the constitution, the supreme law of
the land, is being trampled under foot, and that, too, in a case
where the attorney-general voted to make this unconstitutional
contract, and, as was stated at the bar, and not denied by the
attorney-general, who was present, refused to initiate the litiga-
tion when applied to; for it was stated at the bar that the
governor applied to the attorney-general to bring the suit, and

that he stated that, in view of his peculiar attitude in the
matter, he would have to decline to do so.   For my part, I
think the attorney-general is correct as a matter of propriety.
He would have occupied a strange attitude in bringing a suit
as attorney-general, against himself as a member of the board
of control, to have a contract which he had himself voted to
make, and which, as attorney-general, he had advised the board
of control was valid, set aside by the courts as unconstitutional.
I quite agree with him that he acted with entire propriety, in
view of the circumstances, in declining to bring the suit.   But
to maintain, in this particular situation, that the governor of
the state, the supreme executive of the state, charged by the
constitution, the paramount law of the land, with the duty of
seeing the law faithfully executed, cannot have a suit initiated,
even for the state, at his instance, and that the sovereign state
is absolutely incapable of bringing any suit to have set aside a
contract manifestly and palpably violating both the constitu-
tion and the laws of the land, is to my mind a proposition
which passes all understanding; to me it is simply unthink-
able.

There are some preliminary statements to be made about this
preliminary proposition on which it is proposed to turn this
case off.   It is stated, in the opinion of the chancellor, that it
was conceded in the court below that the governor had the power
to institute the suit.   It is certain that his power was not ques-
tioned in the first oral argument, except in the closing argu-
ment for the appellants.   It is also certain that so little was
thought of the contention that the governor could not sue that
in the written briefs submitted in this cause on the first argu-
ment very little attention was given to the power of the gov-
ernor to sue—so little, indeed, that it was found necessary, at
the instance of one of the members of the court, to remand the
case to the docket for reargument orally on this solitary propo-
sition.   This preliminary statement as to this proposition is

made, not because the court did not have full power to raise the question itself, even if counsel for the appellant had· signed a written agreement waiving the point.   In other words, it is a jurisdictional point, which cannot be waived by consent.   But it is referred to for the very obvious and very proper reason that, if the eminent counsel for the appellants in this case (than whom there are none more able in this commonwealth) had any real confidence in the proposition, they would most undoubtedly have insisted earnestly on it, both in oral argument and in briefs, from the outset.

Let us proceed now to the consideration of this proposition on principle and authority.   In the first place, there are two classes of suits for the state which may be instituted by the governor of the state—one class embracing suits outside the state; the other class, suits within the state.   Here it is to be specially noted that the majority opinion concedes, without reservation, that the governor may institute suits in the name of the state in any other state or foreign jurisdiction.   But it is said this power rests exclusively on Code 1892, § 2167. Notwithstanding this solution, the court cites the cases of *Texas* v. *White,* 7 Wall., 700 (19 L. ed., 227), and *State of Kentucky* v. *Dennison,* 24 How., 66 (16 L. ed., 717).

The suit of *Texas* v. *White* was a suit at the instance of the governor for the state, and was not a suit on bond to recover any debt, but was a suit in the federal court of Texas to compel certain parties to surrender to the state of Texas bonds the possession of which had been illegally obtained.   It was not a suit maintained, therefore, because the bonds were payable to the governor, and does not fall within that class of cases; in fact, the bonds were payable to the state of Texas.   Now what, exactly, did the supreme court of the United States say about this suit instituted by the governor?   Just this—to be found in *Texas* v. *White,* 7 Wall., 718, 719 (19 L. ed., 227):   "The first inquiry to which our attention was directed by counsel arose

upon the allegations of the answer of Chiles: (1) that no suffi-
cient authority is shown for the prosecution of the suit in the
name and on the behalf of the state of Texas, and (2) that the
state, having severed her relation with a majority of the states
of the union and having by her ordinance of secession at-
tempted to throw off her allegiance to the constitution and
government of the United States, has so far changed her status
as to be disabled from prosecuting suits in the national courts.
The first of these allegations is disproved by the evidence. A
letter of authority, the authenticity of which is not disputed,
has been produced in which J. W. Throckmorton, elected gov-
ernor under the constitution adopted in 1866, and proceeding
under an act of the state legislature relating to these bonds, ex-
pressly ratified and confirmed the action of the solicitors who
filed the bill, and empowered them to prosecute this suit; and
it is further proven by the affidavit of Mr. Paschal, counsel for
the complainant, that he was duly appointed by Andrew J.
Hamilton, while provisional governor of Texas, to represent
the state of Texas in reference to the bonds in controversy, and
that his appointment has been renewed by E. M. Pease, the
actual governor. If Texas was a state of the union at the time
of these acts, and these persons, or either of them, were com-
petent to represent the state, this proof leaves no doubt upon
the question of authority." It is thus plainly shown that the
supreme court of the United States did not rest its maintenance
of the right of the governor to sue on any statute of the state
of Texas, and it is malapropos for the majority opinion to cite
that case as supporting the view that the governor can only sue
in a foreign jurisdiction by virtue of Code 1892, § 2167.
On the contrary, the court rested on the distinct announcement
that "if Texas was a state of the union at the time of its acts,
and either J. W. Throckmorton or Andrew J. Hamilton was
governor, there was no doubt as to the authority of such gov-
ernor, or either of them, to sue." The decision proceeded, in

other words, upon the right which the governor had as governor, a right incidental to the power and authority of his office, when absolutely essential to the protection of the rights of Texas.

In *Kentucky* v. *Dennison,* 24 How., 66 (16 L. ed., 717), the suit was again brought on behalf of the state of Kentucky, in the name of the governor of the state, against the governor of Ohio, defending for the state.   There, as here, the defense insisted—see p. 70 of 24 How. (16 L. ed., 717)—that the court had no jurisdiction to maintain the suit, which was one for mandamus, and upon that proposition the court said:   "As early as 1792, in the case of *Georgia* v. *Brailsford,* 2 Dall., 402 (1 L. ed., 433), the court exercised the original jurisdiction conferred by the constitution, without any further legislation by congress to regulate it than the act of 1789.   And no question was then made, nor any doubt then expressed, as to the authority of the court.   The same power was again exercised without objection in the case of *Oswold* v. *State of Georgia,* in which the court regulated the form and nature of the process against the state and directed it to be served on the governor and attorney-general.   But in the case of *Chisholm* v. *Georgia,* at the February term, 1793, reported in 2 Dall., 419 (1 L. ed., 440), the authority of the court in this respect was questioned and brought to its attention in the argument of counsel; and the report shows how carefully and thoroughly the subject was considered.   Each of the judges delivered a separate opinion, in which these questions, as to the jurisdiction of the court and the mode of exercising it, are elaborately examined.   Mr. Chief Justice Jay, Mr. Justice Cushing, Mr. Justice Wilson, and Mr. Justice Blair decided in favor of the jurisdiction, and held that process served on the governor and attorney-general was sufficient.   Mr. Justice Iredell differed, and thought that further legislation by congress was necessary to give the jurisdiction and regulate the manner in which it should be exercised.   But the opinion of the majority of the court upon these points has

been since followed. And in the case of *New Jersey* v. *New York,* in 1831, 5 Pet., 284 (8 L. ed., 172), Chief Justice Marshall, in delivering the opinion of the court, refers to the case of *Chisholm* v. *State of Georgia,* and to the opinions then delivered and the judgment pronounced, in terms of high respect, and, after enumerating the various cases in which that decision had been acted on, reaffirms it in the following words: 'It has been settled by our predecessors, on great deliberation, that this court may exercise its original jurisdiction in suits against a state under the authority conferred by the constitution and existing acts of congress. The rule respecting the process, the persons on whom it is to be served, and the time of service are fixed. The course of the court, on the failure of the state to appear, after due service of process, has been also prescribed.' And in the same case—5 Pet., 289 (8 L. ed., 172) —he states in full the process which had been established by the court as a rule of practice in the case of *Grayson* v. *Virginia,* 3 Dall., 320 (1 L. ed., 619), and ever since followed. This rule directs 'that when process at common law or in equity shall issue against a state, the same shall be served upon the governor, or chief executive magistrate, and the attorney-general of such state.' It is equally well settled that a mandamus, in modern practice, is nothing more than an action at law between the parties, and is not now regarded as a prerogative writ. It undoubtedly came into use by virtue of the prerogative power of the English crown, and was subject to regulations and rules which have long been disused. But the right to the writ and the power to issue it have ceased to depend upon any prerogative power, and it is now regarded as an ordinary process in cases to which it is applicable. It was so held by this court in the cases of *Kendall* v. *United States,* 12 Pet., 615 (9 L. ed., 1181), and *Kendall* v. *Stokes,* 3 How., 100 (11 L. ed., 506, 833). So, also, as to the process in the name of the governor in his official capacity in behalf of the state. In the case of

*Georgia* v. *Madrazo*, 1 Pet., 110 (7 L. ed., 73), it was decided
that in a case where the chief magistrate of a state is sued, not
by his name as an individual, but by his style of office, and the
claim made upon him is entirely in his official character, the
state itself may be considered a party on the record. This was
a case where the state was the defendant. The practice where
it is plaintiff has been frequently adopted of suing in the name
of the governor in behalf of the state, and was, indeed, the form
originally used and always recognized as the suit of the state.
Thus, in the first case to be found in our reports in which a suit
was brought by a state, it was entitled and set forth in the bill
as the suit of *'The state of Georgia by Edward Tellfair, gov-
ernor of the said state, complainant,* v. *Samuel Brailsford et
al.'* And the second case, which was so early as 1793, was en-
titled and set forth in the pleadings as the suit of *'His Excel-
lency, Edward Tellfair, Esq., governor and commander in
chief in and over the state of Georgia, in behalf of the said
state, complainant,* v. *Samuel Brailsford et al., defendants.'*
The cases referred to leave no question open to controversy as
to the jurisdiction of the court. They show that it has been
the established doctrine upon this subject ever since the act of
1789 that in all cases where original jurisdiction is given by
the constitution this court has authority to exercise it without
any further act of congress to regulate its process or confer
jurisdiction, and that the court may regulate and mold the proc-
ess it uses in such manner as in its judgment will best promote
the purposes of justice, and that it has also been settled that
where the state is a party, plaintiff or defendant, the governor
represents the state, and the suit may be in form a suit by him
as governor in behalf of the state where the state is plaintiff,
and he must be summoned or notified as the officer representing
the state where the state is defendant. We may, therefore, dis-
miss the question of jurisdiction without further comment, as it
is very clear that, if the right claimed by Kentucky can be

enforced by judicial process, the proceeding by mandamus is the only mode in which the object can be accomplished." *Kentucky* v. *Dennison,* 24 How., 66-110 (16 L. ed., 717).

Mark specially the latter part of this quotation, where the court says, in the case of *Governor of Georgia* v. *Madrazo,* 1 Pet., 110 (7 L. ed., 73): "It was decided that in the case where the chief magistrate of a state is sued, not by his name as an individual, but by his style of office, and the claim made upon him is entirely within his official character, the state itself may be considered a party on the record. This was a case where the state was the defendant. The practice where it is plaintiff has been frequently adopted in suing by the governor on behalf of the state, and was, indeed, the form originally used and always recognized as the suit of the state." And, again, the case referred to leaves no question open for controversy as to the jurisdiction of the court. They say that it has been the established doctrine upon this subject ever since the act of 1789 that in all cases where the original jurisdiction has been given by the constitution the court has authority to exercise it without any further act of congress to regulate its process or confer jurisdiction, and that the court may regulate and mold the process it uses in such manner as in its judgment will best promote the ends of justice, and that it has also been settled that where the state is a party, plaintiff or defendant, the governor represents the state, and the suit may be in form a suit by him as governor in behalf of the state where the state is plaintiff, and he must be summoned or notified as the officer representing the state where the state is defendant. In both of these cases it is perfectly obvious that the suits were brought by the governor for and on behalf of the state, and were maintained, not because of any statute of Texas or Kentucky, but because of the inherent power which the governor had, as an incident to his office as the supreme executive of the state, "to see that the laws were faithfully executed" and that the rights and interests of

87 Miss.—7

the state should be protected.   It is therefore a vain attempt to
explain the right of the governor of this state to sue in a foreign
jurisdiction on the theory that it rests exclusively on Code
1892, § 2167.

How is it as to the power of the governor to sue on behalf of
the state, in the state?   This power rests directly upon the lan-
guage of the constitution that the governor "shall see that the
laws are faithfully executed."   Every one of the provisions
of sec. 2156 of the code is a mere effort to define what is meant
by this clause of the constitution.   They were wholly unneces-
sary, and it surely is clear that, if this attempted definition has
failed to enumerate all the instances in which the governor, in
the execution of his duty to see that the laws are faithfully ex-
ecuted, may institute a suit, such legislative omission does not
abridge his constitutional power.   Suppose, for example, sec.
2156 had never been passed.   Will any one be so bold as to
maintain that the governor could not have done every single
thing named in this section by authority of this constitutional
power "to see that the laws are faithfully executed?"   And,
if so, can any one fail to see that the basis of his power is con-
stitutional, and not legislative—directly traceable to the clause
we have considered, and not to the superfluous provisions of
sec. 2156?   Great stress is laid, in this connection, upon the per-
fectly familiar proposition, which does not need the citation of
a single authority, that ordinarily the attorney-general, the law
officer of the state, should bring suits for the state.   Where did
the attorney-general get his power to sue for the state?   There
is not a statute authorizing him to bring this suit, not one.   On
the contrary, it is settled by a thousand decisions that the pow-
ers of the attorney-general are those he had at common law
(*People* v. *Miner,* 2 Lans., N. Y., 397), and that the right of
the attorney-general to bring suits where the act to be restrained
is detrimental to the public interest is inherent in the nature of
his office (3 Am. & Eng. Ency. Law [2d ed.], 483, with

the authorities in the notes, where the explicit language is used that this power "exists from the nature of the office, in the absence of express constitutional and statutory powers conferred"). I emphasize this latter clause, and not an authority can be produced to the contrary of the declaration of this established text. If, therefore, the attorney-general, the mere law officer of the state, gets his power to bring suit for and on behalf of the state from the nature of his office as defined by the common law, without even a constitutional or statutory provision on the subject, what must be thought of the contention that the governor, the chief executive of the state, charged expressly by the constitution with the duty of seeing the laws faithfully executed, does not have the right under this provision and from the nature of his office to even begin a suit to restrain the execution of a contract highly detrimental to the interests of the public and baldly subversive of the public policy of the state? I believe I can safely afford to leave the answer to this proposition to be made by the able and splendid bar of this commonwealth. Let it be noted that all the governor claims the right to do is to simply institute the suit. He trenches on no judicial prerogative in doing that. The decision of the case is made by the courts, and not by the governor. He simply invokes, as he has the right to do, the judgment of the court as to the legality of the contract in protection of the interests of the people of the commonwealth.

Now, what authorities are cited by the majority of the court besides those referring to suits by the governor in a foreign jurisdiction? They are, one and all, without exception, cases which lay down the familiar proposition that ordinarily the attorney-general, as the law officer of the state, has the right to sue for the state. Some cases are referred to which deal with the right of the governor to employ additional counsel, not the right to bring suit himself. The Compton case, 38 Ark., 602, is a type of this class, which merely holds that, without an act of

the legislature, the governor could not "so employ counsel as to give counsel a lien on the judgment recovered for the fee in the case." That is the entire holding. Perhaps the chief authority relied upon by learned counsel for appellants to maintain the remarkable proposition that the governor has no power to initiate litigation in the name of the state, although the state's vital interests may be concerned, is the case of *State of Oregon ex rel. Taylor* v. *Lord* (Ore.), 43 Pac., 471 (31 L. R. A., 473). Let us see what, precisely, this case was. It was a suit to enjoin William P. Taylor, H. R. Kincaid, and Phil Metschan, in their capacity as a state board of commissioners of public buildings, from carrying into effect certain acts, not of any board of control, but of the legislative assembly, providing for the construction of a branch asylum in the eastern part of the state, and away from the state capital, because of the alleged unconstitutionality of that part of the act seeking to locate such asylum away from the capital. Now the first thing to be noted about this case is that the court expressly held—31 L. R. A., 483 (43 Pac., 481)—that there was very serious doubt about the unconstitutionality of the legislative act in locating the branch asylum away from the capital, and the court held that because of such serious doubt of its unconstitutionality it would not assume the power to question the legality of the act. In other words, the court did not deem the act unconstitutional; for if it had serious doubt of its unconstitutionality, it was its duty to maintain this act. But as to the parties to this suit— the precise point in issue—what is the fact? The relator was W. P. Taylor, a mere private citizen, who brought the complaint on the ground that he was a resident taxpayer. Now what, precisely, did the court decide in this much relied on case? Why, as to the relator's position, quoting from the syllabus: "First—A private individual cannot have public officers enjoined from using public funds unless some civil or property rights are being invaded. Second—In all cases of purely public

concern affecting the welfare of the whole people or the state at
large the action of the court can be invoked only by such exec-
utive officers of the state as are by law intrusted with the dis-
charge of such duties." And, that the syllabus is correct, let us
quote from the opinion: "We have here to deal with matters
not political, but with matters *publici juris,* and with the acts
of public officers touching the administration of public funds,
and affecting the whole people, or the state at large. And the
question comes to this: Whether the governor, the executive
officer of the state, can be enjoined while in the discharge of
official duties. We speak of the governor, as it is, in effect, the
act of the governor which this proceeding is intended to inter-
dict. True, the act providing for the construction of a branch
asylum at Union and appropriating funds therefor has em-
powered the board of commissioners of public buildings of the
state of Oregon, consisting of the governor, secretary of state,
and treasurer, to superintend the construction thereof; but in
the absence of such a commission it would be the duty of the
governor to see that the law was carried into effect. It is the
duty of the governor 'to see that all laws are faithfully exe-
cuted,' and it is now proposed to execute this law. The judi-
cial department is called upon to prevent its execution. Is it
competent for it to interpose in this proceeding and restrain
the executive department of the state?" From which it ap-
pears that the court dealt with the injunction in that case as
being directed against the governor as the chief magistrate
of the state, and held very properly that it could not be main-
tained. It goes without saying that the difference between
maintaining a bill of injunction against the governor, the su-
preme executive of the state, charged by the constitution with
the duty of seeing that the laws shall be faithfully executed,
and a bill of injunction against the board of control, a mere
subordinate agency, with special, limited powers, is as broad as
the distance from the north to the south pole. But, again, let it

be strictly noted Lord was practically the sole defendant in the cause, and the complainant was a mere private citizen, W. P. Taylor; and we come now to the precise holding of the court, which was that, inasmuch as the matters involved concerned the whole people of the state, a bill on behalf of the people of the whole state could not be brought by a private citizen, but should have been brought by the attorney-general.

To show that the whole scope of the opinion as to the form in which the action was brought was simply a decision, first, that the chief executive could not be enjoined, and, second, that as between a private citizen and the attorney-general the attorney-general was the person to bring the suit, where is there, in this case, the slightest discussion of the right of the governor to bring a suit on behalf of the state under circumstances such as confront us in this case? It must be remembered that the attorney-general, in this case, as shown by the bill, voted for this lease, and that, as stated at the bar, he was requested by the governor to bring this suit, and declined to do so upon the ground of his peculiar situation in the case. What sort of an attitude would the attorney-general have been in if he had filed this bill as complainant against the board of control as defendant, when the record shows him to be voting for the contract and affirming its legality by his opinion? For it must be kept steadily in mind in this discussion that the opinion of the majority of the court goes to the whole length of maintaining, to me, the extraordinary position that under no circumstances whatever that can possibly exist—not even in a case like this, where the attorney-general has, as stated at the bar, positively refused to bring suit—can the governor, for the state, in any way, in any court, initiate litigation which will protect the state against the enforcement of a contract plainly and palpably violative of the constitution and the laws. It is said by the majority that this is a "hiatus" in the law, which the legislature must supply. Is it possible that any more need

be said to show the utterly indefensible position of the appellants in respect to this proposition? For the necessary result must be, if their view be sound—there can be no escape from it—that, although the board of control might make such a contract, that was so plainly and outrageously violative of the constitution of the state and of the laws of the state that any and every person would at once so proclaim it, nevertheless the state would be absolutely impotent to prevent the enforcement of such contract, provided only that the attorney-general refused to bring the suit. I say, without the least hesitation, that such a conclusion is utterly illogical, and is not sustained by a single authority in the United States, as I shall now proceed to show.

So true is it that the attorney-general derives his powers, not from any statute, but from the inherent nature of his office, that it was expressly decided in *People v. Miner, supra,* "that a grant by statute of certain powers would not operate to deprive the attorney-general of those belonging to the office at common law, unless the statute either expressly or by reasonable intendment forbade the exercise of powers other than those expressly conferred." And so exactly is *McQuesten v. Attorney-General,* 72 N. E., 965—a very recent Massachusetts case. If this is true of the attorney-general's powers, how much stronger is the case as to the governor's powers, which rest upon the constitutional provision referred to, beyond the reach of legislative diminution! Throckmorton's case, 98 U. S., 70 (25 L. ed., 93), so confidently relied on, decides nothing in the world except (for every decision is limited by the facts of the case) that the attorney-general of the United States is the proper party to bring an action where the validity of a patent issued by the government is involved, and not local district attorneys charged only with the ordinary duties of those offices; and the reason for this decision is plainly set forth in 3 Am. & Eng. Ency. Law, at p. 477, where the authority and powers of the attorneys-general of the United States are classified. See

6 Opinions of Attorneys-General, 333, in which, amongst other powers, it is said: "He directs and prosecutes appeals in the great questions of land titles, which involve the proprietorship of all the soil in the successive increments of territory acquired by the United States." Of course, where the great questions of title to the proprietorship of the soil of the United States are involved, in the construction of a patent from the government, the attorney-general, and not a mere district attorney, appearing in the usual suits incident to his local office, is the proper person to appear. That is all, absolutely all, decided by the Throckmorton case. There is not a hint or suggestion in the Throckmorton case about the power of the governor to sue for his state.

But it would be very naturally and properly asked, Are there no decisions, have there been no adjudications, on the precise point here involved—to wit, whether the governor of a state has the right simply to institute a suit on behalf of the state where great public interests are involved, and where the attorney-general, as stated at the bar, refuses to sue? There are many such cases, some of which I shall now consider, and I affirm, without the slightest fear of contradiction, that not a single authority in the United States, either federal or state, can be produced denying this power. Are there any affirming the power? Many. In 14 Am. & Eng. Ency. Law—recognized as a standard authority everywhere—at p. 110, it is said (paragraph 2, "Litigation"): "The governor, as the special guardian of the state's interests, is the proper party to initiate necessary litigation. His right to do so is a part of his general power of supervision over the property and welfare of the state." Note, supervision, not only over the property, but "over the welfare, of the state." Again: "Where the governor brings a suit in behalf of the state in his official title, the state, and not the governor individually, is the real litigant." Again: "The governor is the proper relator in a proceeding to compel, by

mandamus, the secretary of state to seal and countersign a com-
mission which the former has issued." Again: "The governor
is the proper party to perfect an appeal in behalf of the state,
especially where the attorney-general is absent from the state."
Is absence from the state any greater—is it as great—a neces-
sity for the action of the governor in bringing a suit than the
positive refusal, as stated at the bar to be the case here, of the
attorney-general, in the state, to institute the suit? Every one
of these propositions is supported by authority.

In *Alexander* v. *State*, 56 Ga., 478, the suit was brought by
the governor for the state, and the point was made by demurrer
to the declaration that the governor had no authority to institute
suit in behalf of the state. And what did the court say in re-
sponse to this contention? This: "The demurrer to the plain-
tiff's declaration on the ground that the governor had no authori-
ty to institute suit in behalf of the state was properly overruled.
The contention of the plaintiff was not objected to until after the
defendant had pleaded to the merits of the action, and, if good,
should have been taken advantage of at the first term by plea in
abatement. But we do not think the objection would have been
good at any time. The governor had the power and authority to
institute suit against the defendant under the general power
granted by the general supervision over all property of the
state, with power to make all necessary regulations for the pro-
tection thereof, if not otherwise provided for, and to engage the
services of any competent person in the discharge of any duties
required by the laws and essential to the interests of the state
or necessary in an emergency to preserve the property or funds
of the state." This decision then cites Code Ga. 1873, §§ 61-74.
But a reading of those provisions and of the constitution of
Georgia, which has, like our own, a provision that the governor
shall see that the laws are faithfully executed, would show that,
if the provisions of the statute had not been passed, the gov-
ernor had by the constitution the same general power of super-

vision over the property, and, as stated, the "welfare, of the state." Here is one square decision in affirmance of the power by a unanimous court, and one of the ablest in the union.

In *Governor* v. *Allen,* 8 Hum. (Tenn.), 176, the suit was in the name of "A. V. Brown, governor of Tennessee." There was a demurrer to the declaration, which was sustained in the court below, and judgment given for the defendant. The bond in the case was made payable to the governor, and, because there was no statute authorizing such bond, it was said the governor could not sue for the state. What did the court say, at p. 181? That "the governor of this state is the executive of it. It is one of his duties, among many others, to see that the laws of the state are executed and obeyed. This is a great and fundamental duty. Without the proper observance of it society might, and would necessarily, be greatly distracted, and the proper security of life, liberty, and property seriously endangered. For the purpose of enforcing the execution of the laws and the protection of the state from rebellion and invasion, he is the commander of the forces of the state. To hold that there can be an interregnum in this office would be to hold to the temporary anarchy of the state, and in order to hold that there is no such interregnum we must hold that the governor as such never dies. To do this he must be the corporation sole, with succession in office. Such we think he is, and constituted so by the organization of our state government, and not by any particular statute or statutes." Here, again, is a second decision squarely affirming the power of the governor to sue, and resting it, not on "any particular statute or statutes," but upon the constitutional power and duty conferred upon him of "seeing that the laws are faithfully executed and obeyed."

In *State of Louisiana on the relation of Francis C. Mahan* v. *Dubuclet,* 22 La. Ann., 602, the suit was a mandamus by a state tax collector against the state treasurer, and the court below directed a mandamus to issue. Afterward the attorney-gen-

eral left the state and was not made a party to the bill; the governor of the state interfered in his own name for the state, and prosecuted the appeal, and a motion was made to dismiss the appeal on the ground that the governor of a state was without power to prosecute. The court said: "The appeal was taken by the governor of the state, who, it is alleged, is without power to prosecute this appeal. It is shown that at the time the appeal was taken the attorney-general was absent from the state. This ground is untenable, the governor being the proper representative of the state and bound to protect her interests." In *State of Louisiana on the relation of Jacob Strauss* v. *Dubuclet,* 25 La. Ann., 161, it appeared that a judgment was rendered in favor of Jacob Strauss, and two appeals were taken, one by the attorney-general and one by special counsel appointed by the governor. A motion was made to dismiss the governor's appeal on the grounds—first, that, an appeal having been taken by the attorney-general, no other appeal could be taken pending the first appeal, and the appeal on the part of the governor was void for want of jurisdiction; second (and let this second ground be especially noted), that no person is authorized to appeal on behalf of the state, except in cases where the attorney-general is unable or unwilling to act. This last is our precise case here—the attorney-general being, as was stated at the bar, unwilling to act. The court says: "Where there is a doubt as to the jurisdiction of the court, we would maintain our jurisdiction in a case in which the whole people of the state are interested, and if this were necessary in order to protect them from what may be a fictitious claim upon the common treasury. But in this case we are not called upon to do so. The law, as well as the spirit of the law, gives us the required jurisdiction. First—It does not follow that, because the state has appealed through the attorney-general, she cannot appeal through the governor as well. He clearly has the right to appeal on behalf of the state, and this right cannot be taken away from him, simply

because another officer of the government has been before him, when he takes the appeal within the delays required by law. In this case the appeal was taken in ample time. Second—It is not legally correct to say that no person is authorized to appeal on behalf of the state, except in cases where the attorney-general is unable or unwilling to act. The prohibition is limited to the employment of counsel other than the attorney-general by the treasurer and auditor, and does not exclude the governor from doing so." What, now, is here decided? That it is a complete *non sequitur* to say that, because the attorney-general may appeal, the governor is thereby debarred from appealing; and yet that is practically the argument for the appellants; and, second, that it is not sound law to hold that no person is authorized to appeal on behalf of the state, except in those cases where the attorney-general is unable or unwilling to act. In other words, there may be cases in which the governor may sue or appeal on behalf of the state, even though the attorney-general is able or willing to act. There is no need to go that far in this case, since the attorney-general has, as was stated at the bar, expressly refused to act. Here, now, are two express decisions in two different cases expressly putting the right of the governor to appeal on the power incident to his office as chief executive and his duty "to see that the laws are faithfully executed."

But the majority say that these two cases which involve that precise question are modified by a third and different case, *State of Louisiana on the relation of Albert Baldwin* v. *Dubuclet, State Treasurer,* 27 La. Ann., 29. What are the facts in this last case? There was a mandamus proceeding, and after decision in the court below an appeal was taken by the attorney-general, made returnable at the session of the supreme court to be held at New Orleans, on the first Monday of November, 1874. Before the return-day, on July 20, 1874, the plaintiff procured the consent of the governor for the transfer of the case

to Monroe, La., and for trial there at an earlier term, and the
governor, acting under the provisions of act No. 21, p. 61, of
the acts of 1872, employed an attorney to take charge of the
defense. The attorney-general objected to the trial of the case,
except at New Orleans and at the time set for the original ap-
peal. He denied the authority of the governor to give consent
for the transfer of the case and denied his authority to ap-
point counsel to assist or supersede him in the management of
the case. Here was a case, let it be specially noted, in which
the attorney-general was present in the state, took the appeal,
and was prosecuting the case—wholly unlike the case at bar in
this respect. What were the provisions of the act? It provided
that the governor "has the right, in case of the absence, death,
resignation, or inability to act, in any particular case, of the
attorney-general or proper district attorney, or where either of
them may be directly interested, to designate an attorney for
such case to act in behalf of the state for the protection of the
public interest." And what was the decision of a majority of
the court? Nothing in the world except that under that statute,
since the attorney-general was not interested nor absent nor
refusing to discharge his duties, but had taken the appeal and
was faithfully prosecuting the appeal, therefore the governor
could not look to that particular statute for authority to em-
ploy counsel. There is not the remotest hint in the case that, if
the attorney-general had been interested or had refused to act,
the governor could not have merely employed assistant counsel.
The whole case plainly went on the bald fact that, since none
of the conditions named in the statute—interest on the part of
the attorney-general, etc.—existed, therefore the governor could
not, under the statute (since the state was thoroughly repre-
sented by the attorney-general, who was faithfully prosecuting
the suit), employ assistant counsel. Here the suit is not being
prosecuted by the attorney-general. He refused, as stated at
the bar, to prosecute, and, as I have said, in my judgment

properly; and here there is no statute such as existed in Louisiana. How it is possible to find any comfort for the contention of my brethren in a case whose facts are such as are the facts in this case in 27 La. Ann., it passes my ability to see. But this is not all about that case. There was a dissenting opinion in that case, by Chief Justice Ludeling, and he held that even in that state of case, since it was made "the duty of the chief executive of the state to see that the laws were faithfully executed," the governor had the power, even under that statute, to transfer that case and employ additional counsel. The case is of no value whatever in the solution of the point whether the governor has the power to sue, in the absence of a statute such as existed in Louisiana, and where the attorney-general, as stated at the bar was the case here, expressly refused to sue, and where, unless the governor has the power to protect the interests of the entire commonwealth from the enforcement of a contract violating the constitution and laws, the sovereign state of Mississippi is bound in helpless fetters and must submit to the execution of such a contract.

How, then, stands the case as to this precise point whether the governor has the power to sue when the attorney-general, as was stated at the bar was the case here, refuses to act for the state? I have produced five authorities—first, the general statement of the text of the Encyclopedia of Law; second, the case from Georgia, *supra;* third, the case from Tennessee, *supra;* fourth, the case of 27 La. Ann., *supra;* and fifth, the case in 26 La. Ann.—all holding, without a dissenting voice, that the governor has the power to institute a suit for and on behalf of the state where the interests of the entire people are concerned and the attorney-general is unable or, as was stated at the bar was the case here, refuses to act, by virtue expressly of the power and duty conferred upon him by the constitution, "to see that the laws are faithfully executed," and that this power rests on the constitution, without reference to any particular

statute or statutes, inherent as a necessary incident to the essential nature and character of his office as the supreme executive of the state. These cases seem hardly to have been paid "the cold respect of a passing glance" by my brethren. Observations are made about the great danger the state would be in if the power of the governor to sue should be upheld. How any danger to the state could possibly be greater than the danger which arises from an announcement of the law that, although grave and paramount public interests affecting the people of the entire commonwealth are involved in a suit brought to test the legality of a contract, and although the attorney-general of the state, present in the state, expressly refuses, as was stated at the bar to be the case here, to bring the suit, nevertheless the governor of the state, its chief executive, cannot even initiate a suit for the purpose of having the illegal and unconstitutional contract delivered up and canceled, passes all understanding. What possible harm could accrue from maintaining the power of the governor to sue? Is a mere institution of a suit a thing big with such dire and dreadful results? What happens after the suit is instituted? Who decides it? Does not the judicial department of the government? Does not this court, the last and highest interpreter of the laws and constitution, ultimately settle the matter, and cannot this court be trusted to decide that matter right? If the construction of the contract is not such as the governor has put upon it, cannot this court so declare, and decide the case against the governor, representing the state? If the construction which he maintains is correct, is it not the duty of the court to pass upon the contract, to consider it, to put at rest finally and authoritatively this much-vexed and all-important question as to the right of the board of control, within its authority under the constitution and the laws, to execute such a contract? I see no danger to arise from entertaining jurisdiction and pronouncing the judgment of the law as to the legality of the contract. I see

by the opposite construction not only a future peril menaced, but a present dire result—to wit, the denial of any remedy to the state to restrain the execution of an illegal contract. The one is fanciful. No governor could by merely instituting a suit, with the decision of which he has nothing to do, in any way affect the interests of the state injuriously. The other is a real, tangible, already-present, public calamity.

The real matter thus submitted for our decision by the bill and by the request of the board of control and of the governor— the one controlling, fundamental matter for decision—is, Was the contract thus made an illegal contract? To that question, which has been from first to last the thing around which public interest centered, I shall now address myself. Before passing to that precise point it may be well simply to note the elementary proposition that where a sovereign state is seeking to enforce its rights—the rights of the entire people—no pecuniary interest is required to be shown. This is fully settled by *Missouri* v. *Illinois,* 180 U. S., 208 (21 Sup. Ct., 331; 45 L. ed., 497), and Debs' case, 158 U. S., 564 (15 Sup. Ct., 900; 39 L. ed., 1092). In order to determine whether this contract violated the provisions of the constitution hereinafter noted, a preliminary statement as to the history of events leading up to the adoption of these provisions is absolutely essential. For some twenty years prior to the constitution of 1890 it may be said, in short, that the history of the treatment of the convicts was a history of cruelties and horrors and infamies such as, fortunately for humanity, have rarely characterized the dealings of any state with its convicts. The convicts had been hawked about over the state during these twenty years and worked on farms and railroads operated by lessees. In both instances, the element of private gain on the part of the lessees was the dominant and controlling factor in the situation. The natural result followed. The insatiable cupidity of the lessees —the *auri sacra fames*—blotted out all feeling of humanity,

and the situation of the helpless convicts, condemned to punishment, presumably, for the chief purpose of reformation, rapidly became such as to excite the pity and arouse the horror and indignation of Christian men and women throughout the length and breadth of the state. It is useless to spend time recounting these horrors, picturing this dark stain upon the fair name of the state. The matter is recent; the air is still echoing with the recital of the horrors. So great was the public indignation upon the subject that a legislative investigation of the convict system of leasing was had in 1884, which resulted in a shocking revelation of cruelties practiced. But, strangely enough, the legislature could not be brought to act. The legislature refused to make any investigation in 1886. In 1888 the legislature was compelled, by force of public opinion aroused by more recent disclosures, to make a second investigation, which resulted, as before, in a revelation of unspeakable horrors. But this investigation, like the former, was followed by legislative inaction. It was impossible to get the legislature to put into the shape of law what the people of the state demanded. And so, at last, the people, in their sovereign capacity, assembled in constitutional convention in 1890, determined not to leave this matter any longer in the hands of the legislature, which had thus signally refused to act in the face of overwhelming evidence, but to place in the constitution itself, the organic law of the land, the inhibitions meant to put an end, once and forever, to the brutalities and cruelties of the convict-leasing system. This is state history, known to all men, and which will not be challenged by any man in the least conversant with the reasons impelling the constitutional convention to take this matter out of legislative control and safeguard it forever by constitutional ordinance. What, now, are these constitutional provisions thus intended to forever end the cruelties and infamies of the convict-leasing system? They are secs. 223, 224, and 225 of the constitution of 1890. The

87 Miss.—8

subject of these sections is "The Penitentiary and Prisons." They are as follows:

### "Article X.    The Penitentiary and Prisons.

"Section 223.   No penitentiary convict shall ever be leased or hired to any person or persons, or corporation, private or public or *quasi* public, or board, after December 31st, A.D. 1894, save as authorized in the next section, nor shall any previous lease or hiring of convicts extend beyond that date; and the legislature shall abandon the system of such leasing or hiring as much sooner than the date mentioned as may be consistent with the economic safety of the state.

"Section 224.   The legislature may authorize the employment, under state supervision and the proper officers and employes of the state, of convicts on public roads or other public works, or by any levee board on any public levees, under such provisions and restrictions as it may from time to time see proper to impose; but said convicts shall not be let or hired to any contractors under said board, nor shall the working of convicts on public roads, or public works, or by any levee board, ever interfere with the preparation for or the cultivation of any crop which it may be intended shall be cultivated by the said convicts, nor interfere with the good management of the state farm, nor put the state to any expense.

"Section 225.   The legislature may place the convicts on a state farm or farms and have them worked thereon under state supervision exclusively, in tilling the soil or manufacturing, or both, and may buy farms for that purpose.   It may establish a reformatory school or schools and provide for keeping of juvenile offenders from association with hardened criminals.   It may provide for the commutations of the sentences of convicts for good behavior, and for the constant separation of the sexes, and for the separation of the white and black .

convicts as far as practicable, and for religious worship for the convicts."

The first thing that strikes one is the imperative command that no convict should ever be leased or hired to any person or persons, or corporations, private or public or *quasi* public, after December 31, 1894, four years after the adoption of the constitution. The second thing which arrests attention is that no previous leasing of convicts is permitted to last beyond that date, and so extremely quickened was the public conscience to the immediate necessity of putting a summary end to the leasing of convicts that the last clause of sec. 223 commanded the legislature to abandon the leasing system as much sooner than December 31, 1894, as would be consistent with the economic safety of the state. The one great thing, standing out as a mountain in the landscape, was the imperative command to the legislature to fix its eye on a positive date—December 31, 1894—and to forever cease the leasing of convicts from and after that date. That was the polestar of the constitutional convention for these sections. Section 224 expressly names the only mode in which convicts could be worked after the date referred to—that is to say, on public roads, or other public works, or public levees—in each and every instance shutting out all private gain by limiting the labor of convicts to employment on public works. And so sedulously careful were the constitution makers to shut out every form and species of hiring out the convicts for private gain that they expressly forbade the hiring of the convicts to any contractors under the levee board, and in addition thereto further stringently and strictly declared: "Nor shall the working of convicts on public roads, or public works, or by any levee board, ever interfere with the preparation for or cultivation of any crop which it may be intended shall be cultivated by the said convicts, nor interfere with the good management of the state farm." The crops referred to here are plainly and manifestly the crops to be cultivated on the convict farm or farms pro-

vided for in sec. 225. This section requires the legislature (for the word "may" here clearly means "must") to place the convicts on a state farm or farms and to have them worked thereon under state supervision exclusively. It was these state farms which the constitution had in mind when it used the language in sec. 224, "any crop which it may be intended shall be cultivated by the said convicts." This is too plain for discussion, both from the whole spirit and scope of the provisions and from the obvious fact that the phrase, "nor should the working of the convicts on public roads," etc., ever "interfere with the cultivation of any crop," etc., is directly connected with and followed by the phrase, "nor interfere with the good management of the state farm." Any layman could see, and plainly see, that the thought was that the primary thing should be the working of the state farms, the cultivation of crops on state farms, and that, while the convicts should be allowed to be worked under exclusive state supervision on strictly public works, not even that method of working convicts should be permitted to interfere with the dominant, fundamental, controlling purpose to cultivate crops on state farms. No ingenuity can obscure this purpose; no technical subtlety, no sophistical refinement, can keep from the apprehension of any just-reasoning man this, the plain, palpable, inescapable meaning of the constitution in these provisions.

Let us summarize what the constitution meant, in the order of importance: First—There never should be any hiring of convicts to any private person, under any pretext whatever, after December 31, 1894. Second—All convicts should be concentrated on state farms after December 31, 1894, which farms the legislature must buy. In the interim until these farms should be bought—the interim between December 31, 1894, and the purchase of such farms—the convicts might be worked on strictly public works, under exclusive state supervision. Third—But such working of convicts on purely public works, even, must never interfere with the primary object of

the constitution, the cultivation of crops on state farms. That, and that alone, is the great overshadowing purpose of the constitution. It is the purpose standing out of the text of these three sections in such clear and commanding relief that no one can fail to see and understand that such is the purpose of the constitution. It was most beautifully said in argument, by one of the most accomplished gentlemen and one of the ablest lawyers in this or any other state, that, if a Switzer should be told that his country was level, he would, for answer, silently point to the snow-capped summits of the Jungfrau and the Matterhorn. And just so here, if one should say that the leasing of land by the penitentiary board of control was lawful, the instant and overwhelming reply would be to point to secs. 223, 224, and 225, the judicial Jungfrau and Matterhorn of this situation. Where, in these sections, can the most astute counsel find authority for leasing farms? No such phrase as "leasing farms" is anywhere in the provisions, nor was "leasing farms" in the minds of the constitution makers. The very soul of these provisions was in direct conflict with the inevitable result of leasing farms, whereunder the private lessor works state convicts for his private gain. Is it possible that one who has grasped the spirit and purpose of these provisions— the absolute shutting off forever of any means whereby private persons could work state convicts so as to make private gain out of their blood and toil—could ever thereafter admit into his mind the conception that the same provisions authorize a leasing by private persons of their farms to the board of control for the purpose of working state convicts on such farms, with the object and result of enriching them through private gain resulting from the toil of the state convicts? Does not the understanding at once grasp the perfectly antipodal and utterly inharmonious purposes thus attributed to the very same sections of the constitution? To my mind it is absolutely unthinkable that power to lease a farm can be worked, by any

sort of refinement, out of provisions like these, in whose fiery and indignant breath all effort to make private gain out of convicts' sweat and blood shrivels up at once. It certainly ought to be unnecessary at this time to cite authorities to show in what spirit courts will interpret constitutional provisions. There is a vast difference between provisions in a constitution and provisions in a statute, that difference being this: that a constitution is a *magna charta* of the people's rights, the fundamental law of the land—intended, not for short periods of time, but for all time. And as a result of this vast difference it is thoroughly understood that provisions of a constitution should receive a broad, liberal, and comprehensive interpretation, and not one which sticks in the letter, but kills the spirit, of the instrument.

I shall refer to but two cases. The first is *Beck* v. *Allen,* 58 Miss., 143, in which Judge Campbell, speaking for the court, said: "Subtlety and refinement and astuteness are not admissible to explain away the expression of the sovereign will. The framers of the constitution and the people who adopted it must be understood to have intended the words employed in that sense most likely to arise from them on first reading them." This doctrine is reaffirmed in *Y. & M. V. R. Co.* v. *Adams,* 77 Miss., 194 (24 South. Rep., 200, 317; 28 South. Rep., 956). The second is the magnificent opinion of Cooper, C. J., in *Ratliff* v. *Beale,* 74 Miss., 247 (20 South. Rep., 865; 34 L. R. A., 472), where he says: "In construing the constitution we are to resort to such rules as would aid in the construction of the statute, keeping always in view the fact that, while statutes descend into particulars and details, constitutions deal usually in generalities and furnish along broad lines the framework of government. To find the true meaning of the language of the constitution we are to look to the existing body of the law, whether common or statutory; to former constitutions, to existing evils, to the object and purposes to be ac-

complished, and to the remedies to be applied. Cooley on
Const. Lim., p. 70; *People* v. *Chautauqua,* 43 N. Y.,
10; End., Interp. Stat., sec. 518." That "may" should be read
"must" in this provision is clearly demonstrated in the follow-
ing cases: *People* v. *Commonwealth,* 22 Barb., 404; *Minor* v.
*Bank,* 1 Pet., 47 (7 L. ed., 47); *Railroad Co.* v. *Walker,* 50
Kan., 739 (32 Pac., 365); *Bansemer* v. *Mace,* 18 Ind., 27 (81
Am. Dec., 344); *Blake* v. *Railroad,* 39 N. H., 437; *Rogers* v.
*Bowen,* 42 N. H., 102; *Milford* v. *Orono,* 50 Me., 529; *Low* v.
*Dunham,* 61 Me., 566. Those cases show, what is elementary,
that when the intention so requires the word "may" should be
interpreted as mandatory, and not directory; and when there
is a great constitutional scheme manifest, as here, of concen-
trating all convicts on state farms within four years, or as
much sooner as the economic safety of the state would permit,
all parts of the section developing the scheme should be con-
strued in aid of the enforcement of the scheme.

I conclude that there has never been any constitutional au-
thority under which the legislature has ever had, at any time
since the adoption of the constitution of 1890, any right what-
ever to lease any farm from any private lessor. It follows,
as a matter of course, that Code 1892, § 3201, in so far as it
authorizes the leasing of convict farms, is a palpable violation
of the provisions of the constitution which we have been con-
sidering. This is made clearer by a consideration of the
last clause, providing "that all the provisions of the law re-
lating to the penitentiary" shall apply to a leased farm and to
any farm provided by the legislature "as a penitentiary or a
part of it." And yet how utterly incongruous it is to con-
tend that the various provisions contained in the statute re-
lating to the regulation of the penitentiary and to the state
farms could be applied to these leased farms! The act of 1894
(Laws 1894, p. 65, ch. 75) was in execution of sec. 225 of the
constitution. It looked to the purchase of as much land as

was necessary to carry into effect the constitutional scheme. The large quantity of land to be purchased and the precautions thrown around the purchase all indicate clearly the legislative intent that the farms so purchased should constitute the penitentiary farms meant by the constitution. This act was passed February 7, 1894, and the legislature, mindful of the fact that the leasing of convicts should cease December 31st of that year, meant to provide for the immediate purchase of farms on which the convicts could be concentrated. At that time the convicts could be dealt with in three ways—kept in the penitentiary proper, then in Jackson; worked on public works; or employed in opening up and cultivating the farms so to be bought. This act was a tardy effort on the part of the legislature to put into execution the mandate of the constitution on this subject. The act of 1900 (Laws 1900, p. 63, ch. 56) by necessary implication practically repealed Code 1892, § 3201, as well as the act of February 7, 1894, in so far as either of these acts purported to authorize the leasing of farms. Both of these acts, the act of 1894 and the act of 1900, provided, not for leasing, but for purchase, of farms; the quantity of land to be purchased indicating that the legislature had at last determined to put into effect the constitutional scheme. Section 4, p. 65, of the latter act provided that "said land when so occupied shall be cultivated by the convicts under the care and control of the board of control, and shall be opened up for cultivation as rapidly as possible." The object was, not primarily to make money out of the convicts, but to safely keep and give them employment in opening up and cultivating farm lands. Section 6, p. 66, of this act is as follows:

"Section 6. Nothing in this act shall affect or impair any contract made by the board of control for the renting or leasing of land for the year 1900; said contract to be executed as heretofore contracted."

It certainly is too plain for disputation that the purpose of

this act is that there shall never be any further leasing of lands after 1900. It is a well-settled rule of law that an expressed exception contained in a saving clause excludes all others. Sutherland's Stat. Const., sec. 328; 26 Am. & Eng. Ency. Law, 723. The argument that the purpose of this section was simply to protect existing contracts is utterly untenable, for that imputes to the legislature the absurdity of supposing that any saving clause was needed to protect rights vested under existing contracts. The plain purpose of said section was to forbid the leasing of farms after the end of the year 1900. This construction is borne out by the fact that the legislature in 1902 (Laws 1902, p. 32, ch. 36) and in 1904 (Laws 1904, p. 25, ch. 24) appropriated $200,000 for the years 1902 and 1903, and for the years 1904 and 1905, "for the support and maintenance and for the equipment and improvement of the penitentiary and state farms." Under the terms of these appropriations made by the legislatures of 1902 and 1904, it is plain that the board of control had no authority to expend a single dollar, except "for the support and maintenance, equipment and improvement, of the penitentiary and state farms." How, then, can the board of control legally, under the contract in this case, expend any of these appropriations during the year 1906 for "clothing, feeding, and caring for the convicts and paying for guards," as expressly required by the terms of this contract? One other observation should be made here, quite significant and important, and that is this: That while, as stated, not a single lease made by the board of control since the constitution of 1890 is valid and legal, this particular contract would be plainly invalidated and illegal by the operation of said act of 1900 repealing the provisions of sec. 3201 of the code attempting to authorize a lease of farms. So that this contract stands stripped, not only of any constitutional validity, but also of any statutory validity; and the board, in making it, violated not only the constitution, but the act of 1900.

Great stress is placed, in the argument at the bar, upon the alleged recognition of these leases of state farms by state legislatures and department officers for a series of some twelve years past. This was precisely the same argument that was made in the case of *Adams* v. *Y. & M. V. R. Co.,* 77 Miss., 194 (24 South. Rep., 200, 317; 28 South. Rep., 956; 60 L. R. A., 33). Many governors were said to have acquiesced in the exemption of the railroad from paying taxes; many legislatures were said to have recognized it; all the tax collectors of the counties through which the railroad ran were alleged to have recognized the exemption; and all that could possibly be made out of that sort of argument—to wit, that the judicial function of interpreting the validity of an exemption statute could be delegated to and exercised by governors, legislatures, tax collectors, and department officers—was most forcibly presented. The contention was, of course, disallowed by this court, which decision was unanimously affirmed by the supreme court of the United States. It is not the function of governors, or legislatures, or tax collectors, or department officers, to construe and interpret the provisions of a constitution or a statute. That is the sole and exclusive prerogative of the judicial tribunals of the land. Interpretation and construction of constitutional and statutory provisions are things exclusively judicial in their nature. Nor is there anything in the talk about the practical construction by these department officers, or legislatures, or governors, for twelve years, or any other period of time, estopping the sovereign state in the courts of the country from having a contract declared violative of the constitution and laws. Authorities could be multiplied by the score to that effect. I content myself simply with a reference to the following on that proposition: 26 Am. & Eng. Ency. Law, 480; *State* v. *Brewer,* 64 Ala., 287; *Haehnlen* v. *Com.,* 53 Am. Dec., 502; *State* v. *Sponaugle,* 45 W. Va., 415 (32 S. E., 283; 43 L. R. A., 727); *State* v. *City of Columbia* (Tenn. Ch. App.), 52 S. W., 511; *Timberlake* v. *Brewer,* 59 Ala., 108; *Long* v. *McDowell,* 107

Ky., 14 (52 S. W., 812); *Worth v. Stewart,* 122 N. C., 258 (29 S. E., 579); *Com.* v. *Bank,* 10 Pa., 442; *Com.* v. *Carter* (Ky.), 55 S. W., 701. The very utmost that could ever be claimed for what is called the practical construction of a constitutional or statutory provision by any other than the judicial department is simply that it may have such merely persuasive force as the courts may see proper to give it in case of doubtful construction; but in cases where there is no room for construction, on any reasonable view either of the constitutional or statutory provisions, even such merely persuasive force becomes valueless. It all comes back inevitably, as a thousand times decided, to the plain, fundamental proposition that it is the function of the courts, and their exclusive function, to construe and interpret the constitution and statutes, and that it is never the function of inferior bodies, or legislatures, or governors, to trench upon the exclusive province of the judiciary by assuming to themselves the judicial function of such interpretation or construction. The very principle so labored in the opinion of the majority as to the independence of the separate departments of the government itself sternly repels the claim of any but the courts to exercise the judicial function. It certainly ought to be clear to the simplest understanding that no construction of a constitution or a statute, by executive or departmental officers who unwarrantedly assume to themselves the judicial prerogative, for however long a period indulged, can sanctify a plain and palpable violation of the fundamental law of the land.

In all that I have so far said, it will be observed that I have dealt with the contract, treating it as a lease of land. I have done so because to treat it as a lease of land is to put the matter in the strongest light possible for the appellants. But there is another view of this contract, taken by the learned chancellor in the court below, and which a fair construction of all its terms fully warrants, and that is that this contract has been

so unfortunately phrased, if it was meant to be a lease of land, that in reality its terms show it to be nothing else than a leasing of convicts. The position of the learned chancellor, as I understand it, is that the things to be done under and in pursuance of the contract, as gathered from the essential terms, demonstrated that it was nothing more nor less than a hiring of convicts. In order that this view may be fully apprehended, the reporter will set out in full the opinion of the chancellor in this case. I only desire to say in respect to this view that I think it is fully borne out by the very clear and able opinion of the chancellor, which needs no support from me. Of course all the world knows that a leasing of convicts would be in plain violation of the constitution. I have thus endeavored to meet, and answer fully, first, the objection that the chancery court had no jurisdiction to issue this injunction because, as alleged, it was an effort to control and direct the discretion of the board of control; and, second, that the chancery court had no jurisdiction to entertain suit because, as alleged, the governor had no power to initiate the litigation. And I have endeavored to demonstrate, and I think I have demonstrated, that the contract is an illegal contract, because it violates both the constitution and the laws, and also because, whatever may have been the intention of the framers of the contract, they have certainly so worded it—and not only so worded it, but made its terms such—as that it is clearly not a lease of land, but a hiring of convicts, which all the world knows is unconstitutional. I must express my profound and emphatic dissent from every conclusion reached by the majority of the court in this case. I regret the decision as one deplorable from every point of view. It magnifies the board of control, and depreciates the dignity and power and authority of the office of governor, the chief executive of the state. But among other things is this decision deplorable in view of the plain, bald fact that, discussing the case on the ground that the governor has no power to

sue and that the attorney-general, although he has refused, as stated at the bar, to file the bill, is the only proper party in this state to bring this suit, the majority of this court thus decide that the state has no remedy whatever to test the legality of this conract, but must submit to its enforcement, helpless and powerless. I emphatically decline to join in the announcement of any such doctrine. The result of the decision is bound to be that no suit can ever be instituted, where the public interests are concerned, in this state, except by the attorney-general, even where the attorney-general refuses to bring suit, which, of course, means that the sovereign state and all its great public interests depend absolutely upon the mere will of the attorney-general. How my brethren can indulge in such grave apprehensions as to the danger to the commonwealth from recognizing the governor's power merely to institute a suit, and yet fail to realize the astounding situation in which they leave the state and its rights, at the mercy of the attorney-general, even though he should refuse to sue, is something extremely difficult for me to understand.